Evan BAYH, as Governor of the State of Indiana, Jerry Thaden, as Commissioner of the Indiana Department of Mental Health, and the Indiana Patient Remuneration Board, Appellants (Defendants Below),

v.

Leo SONNENBURG, Gerald Hartnett, and Dennis Sheffield, on behalf of themselves and all other similarly situated persons, Appellees (Plaintiffs Below).

No. 37S03–9106–CV–437.

Supreme Court of Indiana.

June 12, 1991.

Rehearing Denied Sept. 17, 1991.

Linley E. Pearson, Atty. Gen., Robert S. Spear, Chief Counsel, David Michael Wallman, Deputy Atty. Gen., Indianapolis, for appellants.

Terrance L. Smith, Anthony DeBonis, Jr., Smith & DeBonis, East Chicago, for appellees.

## ON PETITION TO TRANSFER

SHEPARD, Chief Justice.

The Jasper Circuit Court entered a judgment for nearly $28 million against the State of Indiana in this class action brought on behalf of 7400 patients of Indiana's mental hospitals for work they performed while confined in those hospitals in the early 1970's. We hold that the patients are not entitled to compensation and reverse the judgment of the trial court.

### I. Background and Procedural History

On May 23, 1974, Leo Sonnenburg and Gerald Hartnett filed this class action in the LaPorte Circuit Court against then-Governor Otis Bowen and then-Commissioner of the Department of Mental Health William Murray. Plaintiffs sought compensation for labor performed while they were patients in state mental hospitals. The original complaint contended the plaintiffs were entitled to payment under the minimum wage and overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 206, 207 (1988) [hereinafter FLSA],[1] and the involuntary servitude clause of the thirteenth amendment to the United States Constitution.

In March 1976, plaintiffs amended their complaint to add a count based on Indiana's patient remuneration law, Ind.Code §§ 16–13–12.8–1 to –10 (Burns 1973). Indiana's patient remuneration board, which had been created by that law, was added as a defendant. After the United States Supreme Court ruled in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), that the Constitution prohibited application of FLSA to many state employees, plaintiffs again amended their complaint to drop the FLSA count and add a count based on quasi-contract.

In 1978, the trial court entered an order delineating the plaintiff class and granting partial summary judgment for the class based on the patient remuneration law. Defendants perfected an interlocutory appeal from this order. The Court of Appeals reversed both the class determination and the partial summary judgment, and remanded. Bowen v. Sonnenburg (1980), Ind.App., 411 N.E.2d 390. Following remand, the case was venued to the Jasper Circuit Court. Judge Kanne certified Gerald Hartnett and Dennis Sheffield as class representatives; Leo Sonnenburg was not allowed to serve due to mental incapacity.

---

1. Apparently, this lawsuit sprouted from a seed planted by the decision in Souder v. Brennan, 367 F.Supp. 808 (D.D.C.1973), that the FLSA's minimum wage and overtime provisions applied to work performed by mental patients while hospitalized in non-federal institutions.

Judge Kanne also certified the class as "[a]ll patient workers who have labored in the State of Indiana Institutions for the Mentally Handicapped or Mentally Retarded from May 23, 1970 to December 31, 1974." So certified, the class totalled 7419. After the U.S. Supreme Court overruled *National League of Cities* in *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), plaintiffs moved to amend their complaint to resurrect their FLSA claim. Defendants opposed the motion on grounds of prejudice, but the trial court granted leave to amend. It also permitted defendants to file a counterclaim for over $200 million against the plaintiff class seeking payment for the cost of providing hospitalization to class members. The counterclaim was withdrawn by the defendants on October 24, 1986.

A special judge, William Andersen, Jr., was appointed in October 1985, and the case was tried to the bench in 1987. During trial, the plaintiffs introduced a new count based on § 21 of the Indiana Bill of Rights (just compensation for particular services),[2] and raised a claim under 42 U.S.C. § 1983 (1988). The § 1983 claim alleged violations of the thirteenth and fourteenth amendments, the FLSA, and a federal anti-peonage statute, 42 U.S.C. § 1994 (1988).

Judge Andersen rendered a general judgment for plaintiffs without findings of fact and conclusions of law on November 17, 1987. The court awarded nearly $14 million to the plaintiff class, an amount derived by multiplying the number of hours worked by $1.60. On top of this, the court ordered defendants to pay an equal amount in prejudgment interest, bringing the total judgment to nearly $28 million. From this total, the court awarded $5.5 million in attorney fees to plaintiffs' counsel and nearly $84,000 in costs. The court also reserved $2.5 million for potential payments to counsel for post-judgment services. Defendants moved for a stay of judgment pending appeal, pursuant to Indiana Trial Rule 62, which the court granted without a bond.

On appeal, defendants principally contended that the verdict was contrary to law, unsupported by any of the legal theories advanced by the plaintiffs. They also claimed the trial court erred in allowing the total judgment to increase with the discovery of new class members, in awarding prejudgment interest, in awarding costs, and in awarding attorney fees far above the lodestar amount.[3]

The Court of Appeals affirmed in part and reversed in part. It held that plaintiffs were entitled to just compensation for particular services rendered under article I, § 21 of the Indiana Constitution. *Orr v. Sonnenburg* (1989), Ind.App., 542 N.E.2d 201, 205. It refused, however, to allow the judgment to increase as new members of the class were discovered. Over Judge Staton's dissent, the Court of Appeals also reversed the award of prejudgment interest. Having thereby reduced the total award by half, the Court of Appeals vacated the award of attorney fees and remanded to the trial court with instructions to recalculate it. The Court of Appeals did not, however, disagree with the trial court's method for calculating attorney fees. On the contrary, it held that a trial court need not limit a fee award to the lodestar amount and that a trial court may exercise discretion in setting the fee. *Id.* at 207.

---

2. Ind. Const. art. I, § 21. Defendants contend plaintiffs waived this count by failing to amend it to their complaint or include it in their pre-trial brief. Plaintiffs respond that Indiana Trial Rule 15(B) permits a court to decide a case on issues not raised by the pleadings if those issues were tried by the express or implied consent of the parties. During their opening statement at trial, plaintiffs referred to article I, § 21 as one of their several theories of recovery. This placed the defendants on notice, and a four-month break in the trial provided them with ample opportunity to respond. The state constitutional claim was not waived.

3. The lodestar amount is derived by multiplying the number of hours reasonably expended on the case by a reasonable hourly rate. *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 734, 107 S.Ct. 3078, 3091, 97 L.Ed.2d 585 (1987) (O'Connor, J., concurring in judgment).

Both sides have petitioned this Court for transfer. Plaintiffs claim the Court of Appeals erred in refusing to allow prejudgment interest and in refusing to allow the judgment to increase with the discovery of new class members. Defendants claim the Court of Appeals erred: in interpreting article I, § 21; in deciding that attorney fees need not be based on the lodestar amount; and in failing to specify whether the award constituted damages (presumably untaxed) or wages (presumably taxed). Because the Court of Appeals failed to give a statement in writing on plaintiffs' non-constitutional claims, Ind.Appellate Rule 11(B)(2)(e), and because the constitutional issue is one of first impression, App.R. 11(B)(2)(b), we grant transfer and vacate the opinion of the Court of Appeals.

## II. Nonconstitutional Issues Come First

■ The Court of Appeals recognized that there were six theories on which the trial court could have based its verdict, four of which were nonconstitutional theories.[4] *Orr v. Sonnenburg*, 542 N.E.2d at 203–04. The court also correctly noted that the trial court's general judgment must be affirmed if it is sustainable on any theory supported by the record.[5] *Id.* at 204. Without first addressing the viability of the four nonconstitutional claims, the Court of Appeals embraced article I, § 21 of the Indiana Constitution as being "[o]ne of the theories ... upon which the trial court's judgment may be sustained." *Id.* at 204. While a reviewing court can freely choose any apparent statutory or common law basis upon which a judgment can be sustained, constitutional issues are to be

avoided as long as there are potentially dispositive statutory or common law issues still alive. It is "the duty of the court not to enter upon the consideration of a constitutional question where the court can perceive another ground on which it may properly rest its decision." *Bureau of Motor Vehicles v. Scott* (1986), Ind., 497 N.E.2d 557, 559 (quoting *Applegate v. State ex rel. Bowling* (1901), 158 Ind. 119, 124, 63 N.E. 16, 18).

Therefore, before we reach the constitutional questions raised by the parties, we first explore whether the trial court's judgment can be affirmed on one of the four nonconstitutional theories. If it can be, then this Court will not reach the constitutional claims. If it cannot, then plaintiffs' constitutional claims must stand on their own merits.

### A. Section 1983

■ Section 1983 of Title 42 provides a civil remedy against any "person" who, under color of state law, subjects a "citizen of the United States" to the "deprivation of any rights, privileges, or immunities" secured by the federal Constitution or federal laws.[6] Plaintiffs have sued the Governor and the Commissioner of the Department of Mental Health in their official capacities, and the Indiana Patient Remuneration Board. To maintain this § 1983 action, plaintiffs must show that the named defendants are "persons" as that word is used in § 1983. Plaintiffs cite *Stanton v. Godfrey* (1981), Ind.App., 415 N.E.2d 103, for the proposition that state agencies and state government officials, when sued in their official capacities, are "persons" under § 1983. In *Stanton*, the Court of Appeals

---

**4.** Those six theories are:
 (1) the minimum wage and overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 206, 207 (1988);
 (2) the Civil Rights Act, 42 U.S.C. § 1983 (1988);
 (3) Indiana's patient remuneration law, Ind. Code §§ 16–13–12.8–1 to –10 (repealed in 1985 and replaced by Ind.Code §§ 16–13–23–1 to –9 (West Supp.1990));
 (4) unjust enrichment;
 (5) the thirteenth amendment to the United States Constitution; and,
 (6) article I, § 21 of the Indiana Constitution.

**5.** The same standard governs this Court. When reviewing general judgments issued in a civil

case tried to the bench, this Court asks only whether there is substantial evidence of probative value supporting the verdict on any legal theory. We do not reweigh evidence or judge the credibility of witnesses. In examining the record, we consider only the evidence most favorable to the prevailing party along with all reasonable inferences to be drawn from it. *Martin v. Roberts* (1984), Ind., 464 N.E.2d 896, 904; *see also* 4A K. Stroud, Indiana Practice § 12.6, at 140 (1990).

**6.** 42 U.S.C. § 1983 (1988).

held that the Indiana Department of Public Welfare and its administrator, when sued in his official capacity, were "persons" under § 1983. *Id.* at 107. That holding, however, was implicitly overruled by *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), in which the U.S. Supreme Court held the contrary. The *Will* Court stated:

> Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself....
>
> We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983.

*Id.* at 71, 109 S.Ct. at 2311 (citations omitted).

The plaintiffs' § 1983 action therefore fails because the named defendants are not "persons" under § 1983.

B. Indiana's Patient Remuneration Law

■ The General Assembly first passed a patient remuneration act in 1969 as House Enrolled Act No. 1234, but that act was vetoed by Governor Edgar Whitcomb in March 1969 because "the Legislature did not appropriate sufficient funds to finance this program." 1971 Ind.House Journal 114 (veto message delivered to the House of Representatives on January 14, 1971). On January 22, 1971, the General Assembly passed the bill over the Governor's veto. 1971 Ind.Acts 20.

Although the legislature subsequently amended the law several times,[7] the versions of the law relevant to this dispute (the 1971 and 1972 versions) contained the following material provisions. The law established a multi-member patient remuneration board which was responsible for drafting a mental patient pay schedule. This schedule was to classify all work activities performed by mental patients and attach a pay rate to each job. The board was given six months from the effective date of the act to prepare the schedule and present it to the Department of Mental Health's personnel director. The schedule was then to "become effective within thirty (30) days after having been reviewed and approved by the State Budget Agency as to the availability of funds to implement its provisions." 1971 Ind.Acts 2124, 2126 (Pub.L. No. 474, § 3(d)); *accord* 1972 Ind. Acts 10, 12 (Pub.L. No. 3, § 3(d)). Any patient performing work was entitled to remuneration "[o]n and after the date the ... schedule ... shall first become effective ... if funds are available at the rate set forth in the remuneration schedule." 1971 Ind.Acts at 2126 (Pub.L. No. 474, § 3(f)); *accord* 1972 Ind.Acts at 12–13 (Pub.L. No. 3, § 3(f)). Although patients were to be paid for work activities, the law also authorized the state to apply any patient's income exceeding $60 per month to the "charges of the hospital for maintenance, care, and treatment of the patient, to the extent of the charge." 1971 Ind. Acts at 2127 (Pub.L. No. 474, § 4(b)); *accord* 1972 Ind.Acts at 13 (Pub.L. No. 3, § 4(b)). Moreover, the law did not require payment for patient work that was therapeutic. 1971 Ind.Acts at 2128 (Pub.L. No. 474, § 6(c)); *accord* 1972 Ind.Acts at 15 (Pub.L. No. 3, § 7(c)). The legislature appropriated $50,000 per year from the state general fund "to accomplish all of the purposes of this act." 1971 Ind.Acts at 2129 (Pub.L. No. 474, § 9); *accord* 1972 Ind. Acts at 16 (Pub.L. No. 3, § 10).

Plaintiffs contend that the patient remuneration law entitled them to be paid for the work they performed in the mental hospitals. We disagree. The law required that patients be paid *after* the remuneration schedule became "effective." 1971 Ind.Acts at 2126 (Pub.L. No. 474, § 3(f));

---

7. After overriding the Governor's veto in January 1971, the same session of the legislature amended the law in April. 1971 Ind.Acts 2124 (Pub.L. No. 474). The legislature amended the law again in 1972, 1975 and 1978. 1972 Ind. Acts 10 (Pub.L. No. 3); 1975 Ind. Acts 878 (Pub.L. No. 151); 1978 Ind.Acts 726 (Pub.L. No.

21). In 1985, it repealed the act altogether and adopted a drastically different law that prohibited the State from working mental patients without their consent and without pay. 1985 Ind. Acts 227, 260–61, 286 (Pub.L. No. 28–1965, §§ 32, 64) (now codified at Ind.Code §§ 16–13–23–1 to –9 (West Supp.1990)).

1972 Ind.Acts at 12 (Pub.L. No. 3, § 3(f)). The schedule could not become legally "effective," however, until it was drafted by the board, and reviewed and approved by the State Budget Agency. 1971 Ind.Acts 2126 (Pub.L. No. 474, § 3(d)); 1972 Ind. Acts 12 (Pub.L. No. 3, § 3(d)). The board was not appointed until January 9, 1973, and did not adopt a schedule until May 11, 1973. Record at 1543. On August 17, 1973, the board asked the State Budget Agency to review and approve the schedule but the Budget Agency never responded. Because the pay schedule never became "effective," plaintiffs have no right under the act to payment for work performed from 1970 to 1974.

Plaintiffs argue that their right to recover under the act cannot be stripped away by the failure of the patient remuneration board and the State Budget Agency to perform duties mandated by statute. Such a result, argue the plaintiffs, constitutes a "bureaucratic veto" of the law. They point out that in *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838), the U.S. Supreme Court rejected the notion that an executive officer could effectively veto a law by refusing to enforce it. In *Kendall*, that Court held that mandamus would lie against the postmaster general, who had refused to credit Stokes' account as directed by statute.

Federal separation of powers decisions like *Kendall*, of course, do not determine the distribution of powers under article III of the Indiana Constitution.[8] Assuming for sake of argument that mandamus might lie against an Indiana executive officer who fails to perform a duty, such cannot be said to support an award of damages in an action at law. After all, plaintiffs are not here seeking mandamus. They are seeking back wages on the assumption that the patient remuneration board and the State Budget Agency would

have made a series of complicated discretionary decisions in their favor.[9] Even if a mandate had been issued, payments under it would have been severely limited by the legislature's strict appropriation: "There is hereby appropriated annually from the state general fund the sum of fifty thousand dollars [$50,000] to accomplish all of the purposes of this act. The maximum annual expenditure may not exceed this specific appropriation." 1971 Ind.Acts at 2129 (Pub.L. No. 474, § 9); 1972 Ind.Acts at 16 (Pub.L. No. 3, § 10).

Because the patient remuneration schedule never went into effect, plaintiffs have no claim under that law. The judgment of the trial court cannot be affirmed on this theory of recovery.

### C. Fair Labor Standards Act

Plaintiffs contend that they are entitled to compensation under the minimum wage and maximum hour provisions of the Fair Labor Standards Act. FLSA mandates that certain employers pay their employees a federally-established minimum wage and that they not work their employees more than a maximum number of hours each week without premium pay. 29 U.S.C. §§ 206, 207 (1988). Employers who violate these provisions can be sued by their employees for back wages and an equal amount in liquidated damages. 29 U.S.C. § 216(b) (1988).

The history of this act and the Supreme Court's decisions concerning it are central to the resolution of this claim. When FLSA was first enacted in 1938, Congress specifically excluded state government employees from these minimum wage and maximum hour provisions. Fair Labor Standards Act of 1938, ch. 676, § 3(d), 52 Stat. 1060, 1060 (1938). In 1966, FLSA was amended to remove employees of state mental hospitals from this governmental exclusion. Fair Labor Standards Amendments of 1966, Pub.L. No. 89–601, § 102(b),

---

8. *See Risser v. Thompson*, 930 F.2d 549 (7th Cir.1991) (U.S. Constitution does not require a state to imitate separation of powers prescribed for the federal government).

9. Even the *Kendall* Court recognized that relief under mandamus would be limited by legisla-

tive authority over appropriations: "No money was required to be paid, and none could have been drawn out of the treasury without further legislative provision, if this credit should overbalance the debit standing against the relators." *Kendall*, 37 U.S. (12 Pet.) at 614.

80 Stat. 830, 831 (1966). The Supreme Court upheld the constitutionality of this amendment in *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968). In 1974, Congress further amended the act so that it applied to almost all state government employees. Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, § 6(a)(2), 88 Stat. 55, 59–60 (1974). In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court overruled *Wirtz*, and declared unconstitutional the 1966 and 1974 extensions of FLSA coverage to state employees working in "integral operations in areas of traditional governmental functions" on grounds that such an extension unconstitutionally infringed on the states' sovereign powers. *Id.* at 852, 96 S.Ct. at 2474. The Court specifically noted that state hospital employees were included under this umbrella of protected state sovereignty. *Id.* at 855, 96 S.Ct. at 24.

The Court reversed itself nine years later in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 531, 105 S.Ct. 1005, 1007, 83 L.Ed.2d 1016 (1985), declaring that the "traditional governmental function" test it had erected in *National League of Cities* was both "unworkable" and "inconsistent" with the very principles of federalism the test was intended to foster. Under *Garcia*, the 1966 and 1974 extensions of the FLSA are constitutional.

Despite these shifting legal sands, plaintiffs today claim they stand on solid ground in arguing that the FLSA's minimum wage and maximum hour provisions apply to the work they performed for the State between May 30, 1970, and December 31, 1974. We disagree, and hold that plaintiffs are not entitled to recover under FLSA for this time period.

With respect to the maximum hours provision, 29 U.S.C. § 207 (1988), the State is clearly not liable to the plaintiff class. Shortly after the *Garcia* decision, Congress amended FLSA to immunize certain pre–1986 violations. That amendment reads:

(c) *Liability and deferred payment.—*
(1) *No State*, political subdivision of a State, or interstate governmental agency *shall be liable under section 16 of the Fair Labor Standards Act of 1938 for a violation of section* 6 [29 U.S.C. § 206] (in the case of a territory or possession of the United States), *7 [29 U.S.C. § 207]*, or 11(c) (as it relates to section 7) *of such Act occurring before April 15, 1986, with respect to any employee* of the State, political subdivision, or agency *who would not have been covered by such Act under the Secretary of Labor's special enforcement policy on January 1, 1985*, and published in sections 775.2 and 775.4 of title 29 of the Code of Federal Regulations.

Fair Labor Standards Amendments of 1985, Pub.L. No. 99–150, § 2(c)(1), 99 Stat. 787, 788–89 (1985) (emphasis added).

The Department of Labor's special enforcement policy referred to by Congress recognized that state hospitals were within the scope of "traditional governmental functions" and that employees working in such hospitals were thus not protected by the FLSA prior to the *Garcia* decision. 29 C.F.R. §§ 775.2, 775.4 (1985).

The analysis is more complicated with respect to the State's liability under the minimum wage provision, 29 U.S.C. § 206 (1988), because the 1985 Congressional amendment immunized pre–1986 violations only if they were committed by "a territory or possession of the United States." The resolution of the minimum wage issue thus depends on whether *Garcia* or *National League of Cities* controls. This, in turn, depends on the rule about retroactivity.

■ Courts applying federal law must apply the law in effect at the time they decide a case. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 662, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987). Under this general rule, plaintiffs' FLSA claim must be decided based on the *Garcia* decision, even though that case was decided eleven years after the plaintiffs last worked without pay for the State. There are circumstances, however, in which the retroactive application of a judicial decision is not warranted. The defendants argue, and have argued since plaintiffs first moved to amend their

complaint after *Garcia*, that this case presents such circumstances.

■ In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971), the Supreme Court adopted a three-prong test for deciding when not to apply a case retroactively:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." (citations omitted).

Under the *Chevron* test, the party seeking to avoid the retroactive application of a decision bears the burden of persuasion. *Ackinclose v. Palm Beach County*, 845 F.2d 931, 933 (11th Cir.1988).

■ Examination of the three prongs of the *Chevron* test in light of the facts and history of this case leads us to conclude that *Garcia* should not be applied retroactively to hold the State liable for its failure to pay the plaintiffs the minimum wage.

First, *Garcia* overruled a clear past precedent, *National League of Cities*, on which the State of Indiana had relied. Plaintiffs argue that the State could not have relied on the *National League of Cities* case when it decided to refuse to pay them for their work because that case was not decided until 1976, two years after the plaintiffs last worked without pay. This

argument ignores the fact that *National League of Cities* was the law of the land for nine years. Between the *National League of Cities* decision and the *Garcia* decision, the State could have obtained a declaratory judgment establishing that it had no obligation to the plaintiffs under FLSA for the years 1970 through 1974.[10] It did not, in reliance on the continued validity of the holding in *National League of Cities*. Though Justice Dickson, dissenting, calls this reliance a matter of conjecture, the record shows that plaintiffs actually withdrew their FLSA claim altogether just three years after this litigation commenced. The State objected to the resurrection of the claim eight years later, providing the trial court with a direct explanation of the prejudice which such resuscitation represented. It seems fair to suggest that when someone withdraws a claim against you, you naturally act in ways that rely on the withdrawal.

As for the second prong of the *Chevron* test, we think the merits of a retroactive application of the *Garcia* decision are outweighed by the demerits. Although the FLSA was intended to help employees, applying *Garcia* retroactively would place fiscal pressures on the State that could lead to deleterious changes for those very employees. Moreover, retroactive application of the decision is unlikely to encourage greater compliance by the State. We are not alone in concluding the merits are outweighed by the demerits. Other courts and the Congress have taken this view as well. Most compelling is the outcome of the plaintiff in *Garcia*. Although Joe Garcia won his case in the Supreme Court, on remand the Fifth Circuit refused to apply the decision retroactively to allow Garcia to recover, in part because of the burdens that would be imposed on the government employer by retroactive application, and also because of a perception that the rate of compliance would not be enhanced. *Garcia v. San Antonio Metropolitan*

---

**10.** Had the State filed such a declaratory judgment action, there is little doubt that it would have prevailed. Although the *National League of Cities* decision was not handed down until

1976, we are convinced that any court interpreting it before the *Garcia* decision would have applied it retroactively. *See infra.*

*Transit Authority,* 838 F.2d 1411, 1418–20 (5th Cir.1988), *cert. denied* 488 U.S. 889, 109 S.Ct. 221, 102 L.Ed.2d 212 (1988). Congress' 1985 amendments precluding retroactive application of the *Garcia* decision with respect to the overtime provisions of the FLSA were driven by a belief that local governments needed lead time to make necessary adjustments in work practices and fiscal priorities. S.Rep. No. 159, 99th Cong., 1st Sess. 15, *reprinted in* 1985 U.S.Code Cong. & Admin.News 651, 663. Other courts have also concluded the financial havoc that would result from *Garcia's* retroactive application outweighs whatever benefit there is. *Cf. Austin v. City of Bisbee, Arizona,* 855 F.2d 1429, 1433 (9th Cir.1988); and *Brooks v. Village of Lincolnwood,* 620 F.Supp. 24, 26 (N.D.Ill.1985) (refusing to apply *Garcia* retroactively to cover claims against municipalities).

As for the third prong of the *Chevron* test, applying *Garcia* retroactively in this case would produce substantial inequitable results between the patients and the staff of the hospitals. Employees of Indiana's state-run mental hospitals sought compensation under FLSA for work performed prior to May 1, 1974. Although their suit met with success at trial and on appeal to the Seventh Circuit, *Brennan v. Indiana,* 517 F.2d 1179 (7th Cir.1975), it was ultimately dismissed on remand following the Supreme Court's decision in *National League of Cities. See Indiana v. Usery,* 427 U.S. 909, 96 S.Ct. 3196, 49 L.Ed.2d 1202 (1976) (vacating the Court of Appeals' affirmance of judgment for the employees, and remanding for reconsideration in light of *National League of Cities* ). It would hardly be equitable to allow a claim by patients when the employees who cared for the same patients and supervised the patients' work were held not covered by FLSA.

If *Garcia* is not entitled to retroactive application, does *National League of Cities* control this case? Plaintiffs point out that *National League of Cities* was not decided until two years after the patients stopped working without pay. They contend that if the *Garcia* decision is not entitled to retroactive application, then nei-ther is the *National League of Cities* decision, leaving *Maryland v. Wirtz* to control. We disagree.

■ Unlike the *Garcia* decision, the *National League of Cities* decision does not meet all three prongs of the *Chevron* test, and thus, must be applied retroactively. Although *National League of Cities* overruled a clear past precedent, *Maryland v. Wirtz,* plaintiffs have not satisfied either of the other two prongs of the *Chevron* test. We see no inequity in applying the *National League of Cities* decision retroactively, nor do we believe that a weighing of the merits and demerits requires it to be given only prospective relief. Plaintiffs have not cited any state or federal court that has refused to apply the *National League of Cities* decision retroactively. Indeed, the Supreme Court itself applied it retroactively as to eliminate the FLSA claim of this state's regular hospital employees. *Indiana v. Usery,* 427 U.S. 909, 96 S.Ct. 3196, 49 L.Ed.2d 1202 (1976) (vacating *Brennan v. Indiana,* 517 F.2d 1179 (7th Cir.1975), and remanding for reconsideration in light of *National League of Cities* ). With respect to the *National League of Cities* decision, we see no reason to deviate from the general rule on the retroactive application of new court decisions.

### Other Problems with the Claim

While the foregoing analysis is fatal to the plaintiffs' claim, even resolving the retroactivity issue favorably to the plaintiffs leaves several other substantial barriers to recovery. We mention these briefly to illustrate the multiple legal issues which reflect adversely on the claim.

First, it is fairly plain that in enacting the 1966 amendments to FLSA, Congress intended to cover approximately half a million regular employees of state hospitals. *See* S.Rep. No. 1487, 89th Cong., 2d Sess., U.S.Code Cong. & Admin.News at 3002, 3007 n. 2 (1966). The record of the hearings indicates Congress was responding to requests from groups that represented traditional hospital employees, such as the American Nurses' Association and the

Building Service Employees' International Union. *See, e.g.,* Amendments to the Fair Labor Standards Act: Hearings Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 89th Cong., 1st Sess. 1286–93 (1965) (statement of David Sullivan, General President, Building Service Employees' International Union, AFL–CIO, and written statement of the American Nurses' Association). There is nothing to suggest that Congress intended to require states to pay patients in mental hospitals.

Second, FLSA authorizes the prosecution of class actions but only in accordance with a procedure different from the procedures available under F.R.C.P. 23 and Indiana Trial Rule 23. FLSA authorizes class actions only on behalf of class members who have affirmatively elected to participate in the litigation. 29 U.S.C. § 216(b) (1988) ("No employee shall be a party plaintiff to any [class] action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought"). The record plainly reveals that plaintiffs have not complied with this portion of FLSA, except with respect to the named plaintiffs. Any consents to participate given now, of course, would fail under the applicable statute of limitations. 29 U.S.C. §§ 255 & 256 (1988) (both two and three year statute of limitations continue to run against each party plaintiff until that plaintiff's written consent form is filed in court).

Third, the State has raised a substantial defense under 29 U.S.C. § 259, which provides immunity from violations of FLSA for employees who plead and prove good faith conformity with any written enforcement policy of the Administrator of the Wage and Hour Division of the Department of Labor. The written policy implementing the 1966 amendments, DOL Release G–874, exempted work in the nature of therapy. The extent to which the work at issue in this litigation was simple labor

as opposed to therapy is a matter of genuine dispute. Even as to non-therapeutic labor, however, the State maintains a respectable claim of immunity based upon the official policy of the Department of Labor, which was to foreswear any attempt to apply FLSA to residents in hospitals. *See Souder v. Brennan,* 367 F.Supp. at 816 (Appendix B, reciting DOL's October 1969 non-enforcement policy).

### *Principal Conclusion*

FLSA's minimum wage provision did not apply to employees on the payrolls of Indiana's mental hospitals from 1970 to 1974. It did not apply to Joe Garcia. It does not apply to this plaintiff class.

### D. Unjust Enrichment

Plaintiffs' sole common law claim is unjust enrichment, also referred to as quantum meruit, contract implied-in-law, constructive contract, or quasi-contract. A quasi-contract, of course, is not a contract at all; [11] it "is a legal fiction invented by the common-law courts in order to permit a recovery ... where, in fact, there is no contract, but where the circumstances are such that under the law of natural and immutable justice there should be a recovery as though there had been a promise." *Clark v. Peoples Sav. & Loan Ass'n* (1943), 221 Ind. 168, 171, 46 N.E.2d 681, 682. The Restatement of Restitution sets out the theory broadly: "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement of Restitution § 1 (1937).

To prevail on a claim of unjust enrichment, a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust. One who labors without an expectation of payment cannot recover in quasi-contract.

---

11. Quasi-contracts are to be distinguished from both express and implied-in-fact contracts, which are traditional contracts. The matter is the subject of some confusion. *See Health and Hosp. Corp. v. Marion County* (1985), Ind.App.,

476 N.E.2d 887 (rejecting party's petition for rehearing on grounds the party had confused contracts implied-in-fact with contracts implied-in-law).

*Biggerstaff v. Vanderburgh Humane Soc.* (1983), Ind.App., 453 N.E.2d 363, 364.

██ There is not substantial evidence to support plaintiffs' unjust enrichment claim. Plaintiffs did not present substantial evidence to show they expected to be paid. On the contrary, there was uncontroverted evidence showing hospital officials told many of the plaintiffs that they would not be paid for their work. Because the patients labored without expecting payment, they cannot recover in quasi-contract.

Plaintiffs argue that lack of expectation is irrelevant because the State coerced them into working without pay. Where the coercive defendant is a private actor, the law on unjust enrichment supports the plaintiffs' argument.[12] We are not aware of any case in the country, however, in which evidence of *state* coercion has led to a successful claim of unjust enrichment. Where the state has used its coercive powers to seize property or services from a citizen without making just compensation, recovery is more typically based on a constitutional provision, such as the takings clause of the fifth amendment to the U.S. Constitution, or article I, § 21 of the Indiana Constitution. The reason for this is unclear, but may be related to the rule which says recovery cannot be grounded on a claim of unjust enrichment where a contract controls the rights of the parties. *Engelbrecht v. Property Developers, Inc.* (1973), 156 Ind.App. 354, 358, 296 N.E.2d 798, 801. The Indiana Constitution is, in a sense, a contract between the State and its citizens. Article I, § 21 of that Constitution obligates the State to pay just compensation for particular services rendered on demand to the State. Where it is alleged that the State demanded labor from its citizens and failed to make any compensation, a right to recovery, if one exists at all, ought to be based on that "contractual" provision, not on common law principles of equity.

Plaintiffs' unjust enrichment claim fails because they lacked a subjective expectation of payment.

### III. Thirteenth Amendment

Having concluded that the judgment of the trial court cannot be affirmed on statutory or common law grounds, we turn to plaintiffs' constitutional claims. Plaintiffs' first constitutional claim rests on the thirteenth amendment to the United States Constitution. Section 1 of that amendment states: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. Section 2 grants to Congress the "power to enforce this article by appropriate legislation." U.S. Const. amend. XIII, § 2.

██ Defendants dispute plaintiffs' right to sue directly under the thirteenth amendment. They argue that suits can only be based on one of the statutes enacted by Congress under its § 2 authority. They cite several federal cases in support of this argument.[13] Plaintiffs have countered with two contradictory responses. At trial, plaintiffs conceded that they were not seeking to make the thirteenth amend-

---

12. *See, e.g.,* Restatement of Restitution § 70 (1937); *Baldwin v. Hutchison* (1893), 8 Ind.App. 454, 35 N.E. 711 (permitting a mentally deficient man to rescind a contract and recover in restitution money paid to a savvy businessman who had threatened, without good cause, to have the man thrown in jail for damaging statements he made under oath in court).

13. *Clark v. Universal Builders, Inc.,* 409 F.Supp. 1274, 1279 (N.D.Ill.1976) (dismissing claim based directly on thirteenth amendment in action against seller of homes who had allegedly discriminated against black purchasers); *Sanders v. A.J. Canfield Co.,* 635 F.Supp. 85, 87 (N.D.Ill.1986) (dismissing plaintiff's employment discrimination claim based directly on the thirteenth amendment); *Westray v. Porthole, Inc.,* 586 F.Supp. 834, 838–39 (D.Md.1984) (dismissing claim based directly on thirteenth amendment in suit against a nightclub that had refused to admit black patrons); *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan,* 518 F.Supp. 993, 1012 (S.D.Tex.1981) (suggesting the thirteenth amendment does not create direct cause of action); *Lopez v. Sears, Roebuck & Co.,* 493 F.Supp. 801, 806–07 (D.Md. 1980) (dismissing employment discrimination claim based directly on thirteenth amendment).

ment claim an independent cause of action. In closing argument, counsel for plaintiffs acknowledged that "1983 provides the remedial vehicle through which that 13th Amendment cause of action is presented." Record at 2514. On appeal, however, plaintiffs resurrected the thirteenth amendment as an independent cause of action. Brief of Plaintiffs–Appellees at 56–57. Were plaintiffs able to recover fully under § 1983, it would not matter whether recovery could also be based directly on the amendment. Because § 1983 does not provide them any relief, however, this dispute becomes important.

We conclude suit may be based directly on the amendment when attacking slavery itself or other forms of compulsory labor akin to slavery. *Civil Rights Cases*, 109 U.S. 3, 20 (1883) (amendment "[b]y its own unaided force and effect ... abolished slavery"); *Slaughter–House Cases*, 83 U.S. (16 Wall.) 36, 69, 71–72, 21 L.Ed. 394 (1873) (the term "involuntary servitude" abolishes peonage); *Butler v. Perry*, 240 U.S. 328, 332, 36 S.Ct. 258, 259, 60 L.Ed. 672 (1916) (amendment covers "those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results"). Though defendants are apparently correct that suits attacking the "badges and incidents of slavery" must be based on statute, suits attacking compulsory labor itself may rest on the thirteenth amendment. *Compare Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 439, 88 S.Ct. 2186, 2203, 20 L.Ed.2d 1189 (1968) (under § 2, Congress may attack "badges and incidents of slavery" through legislation), *with Palmer v. Thompson*, 403 U.S. 217, 226–27, 91 S.Ct. 1940, 1945–46, 29 L.Ed.2d 438 (1971) (refusing to hold the amendment itself is broad enough to abolish directly all "badges or incidents"). Those cases cited by defendants do nothing to dispel this distinction. All of the cases centered around "badges and incidents" of slavery and did not attack a system of compulsory labor. Here, of course, plaintiffs claim to be attacking a system of compulsory labor, not the mere "badges and incidents" of slavery. Where such is the claim, suit may

be brought directly under the thirteenth amendment.

 Resolving this point, however, does not mean the thirteenth amendment was actually violated, or that an award of damages is the proper remedy for such a violation. The Supreme Court has repeatedly held that "not all situations in which labor is compelled ... violate the Thirteenth Amendment." *E.g., United States v. Kozminski*, 487 U.S. 931, 943, 108 S.Ct. 2751, 2760, 101 L.Ed.2d 788 (1988). The prohibition against involuntary servitude does not prohibit states from compelling their citizens to perform certain civic duties. *Hurtado v. United States*, 410 U.S. 578, 589–90 n. 11, 93 S.Ct. 1157, 1164–65, 35 L.Ed.2d 508 (1973) (payment of $1 a day to material witness while incarcerated to ensure appearance at trial does not violate thirteenth amendment); *Selective Draft Law Cases*, 245 U.S. 366, 390, 38 S.Ct. 159, 165, 62 L.Ed. 349 (1918) (compulsory service in armed forces does not violate amendment); *Butler v. Perry*, 240 U.S. 328, 36 S.Ct. 258, 60 L.Ed. 672 (1916) (upholding constitutionality of state law requiring all able-bodied adult male citizens to work on roads and bridges). Nor does the amendment apply to "certain descriptions of service which have always been treated as exceptional." *Robertson v. Baldwin*, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715 (1897) (sailors may be compelled by force of law to complete voyage with ship). The Court explained the reasons behind the "civic duty" exception in *Butler v. Perry:*

[T]he Thirteenth Amendment declares that neither slavery nor involuntary servitude shall exist. This amendment was adopted with reference to conditions existing since the foundation of our Government, and the term involuntary servitude was intended to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results. It introduced no novel doctrine with respect of services always treated as exceptional, and certainly was not intended to interdict enforcement of those

duties which individuals owe to the State, such as services in the army, militia, on the jury, etc. The great purpose in view was liberty under the protection of effective government, not the destruction of the latter by depriving it of essential powers.

240 U.S. at 332–33, 36 S.Ct. at 259–60. We think the facts of this case fit squarely within this "civic duty" exception.[14]

Plaintiffs cite several cases which they contend hold that work performed by mental patients is within the scope of the thirteenth amendment. *Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala.1972), *aff'd in part and remanded in part sub nom., Wyatt v. Aderolt,* 503 F.2d 1305 (5th Cir. 1974); *Weidenfeller v. Kidulis,* 380 F.Supp. 445 (E.D.Wis.1974); *Arahovitis v. State,* 120 Misc.2d 917, 466 N.Y.S.2d 928 (1983); and *Jobson v. Henne,* 355 F.2d 129 (2d Cir.1966). We observe that the thirteenth amendment was not at issue in *Wyatt,*[15] and was not mentioned in *Arahovitis. Jobson* was a § 1983 case. The defendants in *Weidenfeller* were private hospitals, and that court incorrectly relied on *Jobson.* As a result, these cases have little persuasive value.

Finally, even if the thirteenth amendment were directly applicable in this case, it is not apparent that it would support an action for damages. The few actions brought directly under the amendment have sought either writs of habeas corpus or declaratory judgments. *See Peonage Cases,* 123 F. 671, 675 (M.D.Ala.1903). Al-though the U.S. Supreme Court has held that damages may be obtained for direct violations of other constitutional amendments, *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 395–97, 91 S.Ct. 1999, 2004–05, 29 L.Ed.2d 619 (1971) (fourth amendment) and *Davis v. Passman,* 442 U.S. 228, 245–48, 99 S.Ct. 2264, 2277–79, 60 L.Ed.2d 846 (1979) (fifth amendment due process clause), it has never reached a similar conclusion with respect to violations of the thirteenth amendment. We decline to so hold.

Although we hold plaintiffs may sue directly under the thirteenth amendment, the judgment of the trial court cannot be affirmed on this basis.

### IV. Indiana's Constitutional Protections

We come to plaintiffs' claim under § 21 of the Indiana Bill of Rights, which provides: "No person's particular services shall be demanded, without just compensation." Ind. Const. art. I, § 21. Plaintiffs claim the State violated this provision by forcing them to work without pay during their hospitalization. To prevail on this claim, plaintiffs must demonstrate: (1) that they performed particular services, (2) on the State's demand, (3) and did not receive just compensation.

Plaintiffs have presented substantial evidence that their work was rendered on the State's demand. The services they performed, however, were not particular services within the meaning of § 21. Moreover, by the measure of damages appropri-

---

**14.** Our conclusion on the thirteenth amendment is buttressed by our analysis of plaintiffs' state constitutional claim. *Infra* at 411–417. The two provisions share a common heritage. The framers of both the thirteenth amendment and article I, § 21 of the Indiana Constitution were strongly influenced by a provision in the Northwest Ordinance prohibiting involuntary servitude. *See generally United States v. Shackney,* 333 F.2d 475, 483–84 (2d Cir.1964) (discussing the history of the thirteenth amendment). We also note that the Supreme Court of Georgia refused to apply the thirteenth amendment to persons who performed work while under the care of that state's "benevolent institutions."

*Kennedy v. Meara,* 127 Ga. 68, 56 S.E. 243 (1906).

**15.** *See Wyatt v. Stickney,* 325 F.Supp. 781, 784 (prior opinion). The trial court there concluded that the poor standard of care in one of Alabama's mental hospitals implicated *unspecified* portions of the Constitution. In reaching this conclusion, the trial court cited *Rouse v. Cameron,* 373 F.2d 451 (D.C.Cir.1966). *Rouse* held that a mental hospital's poor standard of care could raise several constitutional questions, including procedural due process, equal protection, and the prohibition against cruel and unusual punishment. *Id.* at 453. *Rouse* did not, however, mention the thirteenth amendment.

ate under § 21, plaintiffs have not been denied "just compensation."

### A. Particular Services

■ The plaintiffs' evidence reveals that members of the class performed a variety of work activities while hospitalized. Patients worked in hospital kitchens fixing meals and scrubbing dishes, on the grounds cutting grass, in beauty salons cutting and styling other patients' hair, in a bowling alley maintaining the lanes and pinsetting machines, in administrative offices doing secretarial and clerical work, in the laundry washing sheets and clothes of other patients, in a garage repairing vehicles used at the hospital, in clinics bathing and feeding physically ill patients, and throughout hospital buildings scrubbing floors and cleaning.

For most patients these jobs were full-time. Five days a week the patients would rise in the morning, eat breakfast, go to work, break for lunch, stop work in the mid or late afternoon, return to their wards, eat dinner, and then relax in the evening. Considering this body of evidence, the question before this Court becomes: does such work fall within the meaning of "particular services" as that term is used in the Indiana Constitution?

This Court has regarded the task of interpreting particular provisions of the Indiana Constitution as a search for the common understanding of both those who framed it and those who ratified it. *Bishop v. State ex rel. Griner* (1898), 149 Ind. 223, 230–31, 48 N.E. 1038, 1040; *accord Kirkpatrick v. King* (1950), 228 Ind. 236, 242–43, 91 N.E.2d 785, 788. We have also said that "in placing a construction upon a constitution or any clause or part thereof, a court should look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the rem-

edy." *State v. Gibson* (1871), 36 Ind. 389, 391.

We turn first to the circumstances surrounding the adoption of the particular services clause at the constitutional convention. When the constitutional convention met in late 1850 and early 1851 to draft a new constitution, it considered provisions from a variety of sources, including the 1816 Constitution and resolutions submitted by the convention delegates. The 1816 Constitution contained a provision declaring that: "no man's particular services shall be demanded, or property taken or applied to public use, without the consent of his representatives, or without a just compensation being made therefor." Ind. Const. art. I, § 7 (1816).[16] One of the delegates to the 1850 convention offered a resolution directing the committee on rights and privileges to inquire into the expediency of adopting the 1816 provision as part of the new Constitution. I *Constitution Making in Indiana* 235 (1916, reprinted 1971). As reported out of committee on October 26, 1850, the provision read in relevant part: "No man's *personal* services shall be demanded without just compensation." 1 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana 1850*, at 226 (1850) (emphasis added) [hereinafter *Debates* ]. The matter apparently had been the subject of contention in committee, for a minority report was filed urging use of language nearly identical to that used in the 1816 Constitution. *Id.* at 226–27.

The Convention discussed what is now § 21 for six days. Much of the floor debate centered on the proper adjective to modify the word "services." Several delegates objected to the word "personal," believing that its breadth would prevent the State from requiring citizens to perform certain duties previously provided

---

**16.** This provision appears to have been derived from a similar clause in the Northwest Ordinance. *An Ordinance for the government of the United States northwest of the river Ohio,* July 13, 1787, § 14, art. 2, *reprinted in* 1878 U.S.Rev. Stats. 13, 15 (2d ed.). Our 1816 provision and the Northwest Ordinance followed the Magna

Carta and American colonial charters in permitting takings without compensation if the people's elected representatives consented. *See generally* Shepard, *Land Use Regulation in the Rehnquist Court: The Fifth Amendment and Judicial Intervention,* 38 Cath.U.L.Rev. 847, 853–55 (1989).

gratuitously. Those favoring the term "personal" argued that the old constitution had led to demands on the services of citizens which should have been compensated but were not.

The record of this lengthy debate over whether to use "personal" or "particular" provides insight into the meaning of § 21. For example, Mr. Clark from Tippecanoe County suggested that using the word "personal" would prevent the State from requiring citizens to attend militia training, or to work on road improvements in their immediate district without pay. *Id.* at 359. Mr. Bright feared the State would be required to pay for a citizen's participation in a posse comitatus. *Id.* at 359–60. Mr. Nave feared that using "personal" would require payment to those who testified before a grand jury. *Id.* at 367. Mr. Niles believed that the State would have to pay road supervisors, jurors and witnesses in criminal cases. *Id.* at 368. It was exactly this last point, failure to pay witnesses, which led many to support using "personal." Delegate Pettit said:

> Notwithstanding this provision, we have laws compelling a witness to go from end to end of the State, to testify in a criminal prosecution without compensation, unless the trial results in the conviction of the prisoner, a law which I look upon as being not only oppressive, but manifestly inconsistent with this provision of the Constitution.

*Id.* at 355.

Arguing for retention of the 1816 phrase "particular services," Mr. Clark offered a vague definition of "particular services" that has served as the primary test for distinguishing particular services from general ones. "I take it that the word *particular*, in the old Constitution, means, not that general service which every citizen is bound to render, but something specific— something that is required of him as an individual, in contra-distinction to what is required, generally, of all citizens." *Id.* at 359.

Although some delegates were less clear on the exact meaning of "particular services," *see, e.g., id.* at 355 (delegate Pettit confessing he did not know what was meant by "particular services"), others agreed that placing the 1816 language in the new constitution would reaffirm the status quo. "[T]here are many personal services required of individuals which never have been paid for, and which, I presume, it is not the intention of those who framed this section, should be paid for hereafter." *Id.* at 360 (delegate Bright from Jefferson County).

Even those who disagreed with retaining the word "particular" acknowledged the effect of retaining it. Delegate Chapman's position was representative:

> No word in any language, is more restrictive and constrictive than the word "particular"....
>
> A multitude of services are now demanded of individual citizens, which ought to be paid for, though they are not, and probably will not be, under your amendment; for the action of the Convention in this particular, will be considered as a sanction of the past and existing state of things.

*Id.* at 400. The amendment to use the word "particular" was adopted by the delegates on a vote of 71 to 20. *Id.* at 387–88.

The convention's preference for "particular" over "personal" is critical in this case. It is clear that the framers did not intend this clause to create new rights to compensation for services provided to the State that had gone historically uncompensated.

This Court's decisions addressing the "particular services" clause follow the principles found in the debates. In *Israel v. State* (1857), 8 Ind. 467, this Court refused to require the State to pay fees to witnesses in criminal trials. Declining to further define the meaning of "particular services," the Court followed history. "The old constitution contained a like provision, but we believe it never was understood to extend to witnesses in criminal trials, and the provision in the new constitution should not be so understood." *Id.* at 468.

In *Blythe v. State* (1853), 4 Ind. 525, this Court reversed a finding of contempt against an attorney who refused to provide uncompensated legal services for a poor

person charged with a crime.[17] This holding was repeated in *Webb v. Baird* (1854), 6 Ind. 13, in which the Court noted that because attorneys no longer enjoy any special privileges or pecuniary emoluments under the law, "the public can no longer justly demand of that class of citizens any gratuitous services which would not be demandable of every other class." *Id.* at 17. (By contrast, of course, the claimants in this case received enormous benefits from the public.) The Court concluded that an attorney's legal services constitute his means of livelihood and are "no more at the mercy of the public, as to remuneration, than are the goods of the merchant, or the crops of the farmer, or the wares of the mechanic." *Id.*[18] Likewise, in *Buchman v. State* (1877), 59 Ind. 1, this Court held that doctors giving expert medical testimony at trial were entitled to be justly compensated. The Court distinguished between a witness who is called because he has observed matters under factual dispute and a witness who is called to give an expert opinion. The Court drew on the analysis in *Webb v. Baird* and said of the physician: "Is not his medical knowledge his capital stock?" *Id.* at 13.

This Court has also held that extra work performed by public officials whose salaries are set by statute does not constitute "particular services." *Board of Commissioners of Miami County v. Blake* (1863), 21 Ind. 32; *Falkenburgh v. Jones* (1854), 5

Ind. 296. Finally, we have held that bank officers obliged to spend part of their working day assisting tax auditors find business records relevant to the audit were not entitled to be compensated by the State for their labor. *Washington Nat'l Bank v. Daily* (1906), 166 Ind. 631, 77 N.E. 53. The *Daily* Court concluded that the time spent assisting the auditors was minimal and was a general service which all citizens owed to the state in order to further tax collections.

With this understanding of "particular services" in mind,[19] we turn to the question at hand: Did the work performed by the plaintiff class constitute "particular services?" We conclude that it did not, for two reasons.

### 1. No History of Payment

Because the people of Indiana, acting through their delegates, chose to reaffirm historical practice with respect to payment for "particular services," we look first to this history. There is no historical evidence that mental patients were ever compensated for work performed while hospitalized in Indiana's mental institutions from the time of statehood to the filing of this lawsuit. All the evidence is to the contrary; Indiana's many laws concerning the mentally ill contemplated the use of patient labor without paying wages.

The earliest provision we have found concerning State responsibility for the care of the mentally ill is in the 1816 Constitution.

---

**17.** It is difficult to know what one should make of the Court's declaration that Ind.Rev.Stat., pt. 2, ch. 1, § 15 (1852) was unconstitutional under § 21. The statute authorized appointment of pauper counsel in civil cases only and could not have applied to the case before the Court. Attorney Blythe had been appointed to represent a defendant in a criminal case.

**18.** The dissent cites *Webb v. Baird* as evidence of a willingness, in the very shadow of the 1850–51 Convention, to declare new rights to payment for services historically rendered free. Dissent op. at 425. Actually, the *Webb* Court was quite candid in acknowledging that there was no existing right to pauper counsel in criminal cases. The Court created that right in 1854 and, with it, the right to compensation.

**19.** Only Tennessee and Oregon have similar provisions in their state constitutions. Tenn. Const.

art. 1, § 21; Or. Const. art. 1, § 18. Tennessee's Supreme Court uses a definition of particular that is similar to ours. "Particular services must mean peculiar services, limited services, not ordinary or general services of an individual.... It seems clear that ordinary services, such as may be required of all citizens or officials by general or valid special laws, are not particular services." *Henley v. State,* 98 Tenn. 665, 684, 41 S.W. 352, 355–56 (1897). The decisions about services are also similar. *See, e.g., Rushing v. Tennessee Crime Comm'n,* 173 Tenn. 308, 117 S.W.2d 4 (1938) (trial witnesses provide general, not particular, services and need not be paid); *Neely v. State,* 63 Tenn. 174 (1874) (jurors may be required to serve without pay). *But see Wright v. State,* 50 Tenn. (3 Heisk.) 256 (1871) (attorney may be required to defend prisoner without compensation).

It shall be the duty of the General assembly, as soon as circumstances will permit ... to provide one or more farms to be an asylum for those persons, who by reason of age, infirmity, or other misfortunes, may have a claim upon the aid and beneficence of society; on such principles, that such persons may therein, find employment, and every reasonable comfort and lose, by their usefulness, the degrading sense of dependence.

Ind. Const. art. IX, § 4 (1816). This section clearly contemplates that those committed might be allowed or required to work.

To discharge its responsibility under the 1816 Constitution, the General Assembly created a judicial process by which persons could be adjudged insane and placed under the care of guardians, who were empowered to invade the estate of the insane to pay for their care and the care of their families. *See, e.g.,* Ind.Rev.Stat. ch. 46, §§ 166–194 (1843). Once the estate was expended, or if there had been no estate to begin with, the insane were to be treated according to the poor laws then in effect. Ind.Rev.Stat. ch. 46, § 181 (1843). These poor laws permitted indigents to be committed to asylums and employed therein. Ind.Rev.Stat. ch. 19, § 37 (1843). They did not contain any provision for payment. This Court had recognized that persons under care of such schemes could be required to work towards their upkeep. *See Demar v. Simonson* (1835), 4 Blackf. 132. Care for the insane became more centralized once the General Assembly authorized the building of a hospital for the insane in 1846 and created a board of commissioners to oversee it. 1845 Ind.Gen.Laws 116 (ch. 118); 1846–47 Ind.Gen.Laws 99 (ch. 66).

The 1851 Constitution repeated the 1816 pronouncement that the General Assembly bore the responsibility of providing for the mentally ill. "It shall be the duty of the General Assembly to provide, by law, for the support of institutions for the education of the deaf, the mute, and the blind; and for the treatment of the insane." Ind. Const. art IX, § 1 (1851). It was the subject of short debate on the floor of the convention. The only inference which can be drawn from this debate is that there

was opposition to financing state farms for the insane in addition to the existing hospital. 2 *Debates* at 1902–03.

In 1905, the legislature authorized establishing a village in New Castle to provide work for persons afflicted with epilepsy, which at that time was considered a mental illness. 1905 Ind. Acts 483 (ch. 159, § 1). In 1919, the legislature authorized creation of a farm colony, and specifically instructed the superintendent of the farm to utilize patient labor to construct it:

It is declared to be the purpose and policy of the state with respect to the institution established by this act, that the buildings to be constructed for its use shall be plain and inexpensive in character and that the labor in constructing such buildings, improvements and facilities shall be supplied as far as applicable by the persons committed to the institution.

1919 Ind. Acts 480, 482 (ch. 94, § 6). Doctor William Murray confirmed at trial that mental patients actually worked under these laws. *See* Record at 1826–27.

Although many of these statutes make direct or indirect reference to patient labor, none mentions patient compensation. Indeed, there is no evidence in fact or law to suggest that Indiana had ever paid any patients for their work prior to this lawsuit. To be sure, unconstitutional acts do not become constitutional through age or repetition. In light of the decision of the framers of the 1851 Constitution to preserve the limited "particular services" clause as a reaffirmation of historical practice, however, we think the plaintiffs' assertion that § 21 invalidates this historical practice is untenable.

### 2. Patient Work Was "General" not "Particular" Services

Historical practice aside, there are significant distinctions between patient labor and particular services which prevent affirming the trial court's verdict.

The Indiana Constitution is a social compact among the people and between the people and their government. As part of

this compact, citizens are required to yield property and general services to the State in loose exchange for the State's protections. This exchange is not a perfect one. Some citizens give the State much, but receive little in return; others receive much although they have given little. In drafting the Constitution, the framers understood that exchanges between the State and its citizens under this social compact would be uneven, and did not intend the particular services clause to prevent this outcome. Delegate Clark explained:

> There are other duties which belong to the State to perform towards citizens in their collective, political, and social condition. Whilst we are careful to recognize individual rights, and protect them, we must bear in mind that the State is the representative of the collective body,— the guardian of the general welfare, as also, the protector of individuals. It must not be deprived of all sovereignty over individuals or their property, or in many instances, it would be powerless to do what is required of a sovereign state to perform.

1 *Debates* at 358.

Under article I, § 21, no one is entitled to a refund or an accounting as a remedy for a lopsided exchange under this social compact. In order to find for the plaintiff class in this case, we would be required to conclude that their work was not part of the social compact, but instead was the result of the State's isolated and unreasonable demand upon their services which ought to be paid for by the public at large. The facts of this case suggest, however, that the State's demand was neither isolated nor unreasonable. Like any other general service, the demand was but one of the many obligations that all citizens may be required to render to the State as part of the social compact.

The demand is not an isolated one. Care for the mentally ill is part of the bundle of services provided by the State to all Hoo-

siers. As part and parcel of this service, the people, through their elected representatives, have chosen to condition the benefit with a burden. In exchange for the benefit of state-run mental hospitals, we all bear the burden of contributing our labor to reduce the costs associated with our own hospitalization.[20] Just as only a few serve as witnesses, only a few end up in mental hospitals. No citizen is exempt from these requirements.

The State's demand was not unreasonable. The work requirement was reasonably related to the patients' hospitalization. The plaintiff class was, in many ways, the direct and primary beneficiary of its own labor. The plaintiffs performed tasks that improved their daily lives. Had the State required every patient to cook his own food and wash his own clothes, the connection between each patient and the benefit of his labor would have been undeniably clear. Although the State's decision to divide the tasks, specialize the labor and take advantage of economies of scale somewhat blurs the connection, the connection remains quite real. Work has been characterized as a "general service" when those performing the work have been the primary beneficiaries of the work product. For example, the "particular services" clause has never barred the practice of requiring men to work without pay for a few days each year on highway construction projects in the district in which they lived. *See* Ind.Rev. Stat. 339, ch. 16, § 101 (1843) (requiring male citizens to work two days each year); 1 *Debates* at 359 (such work is a "general service").

Plaintiffs not only benefitted from the fruits of their labor, but also from the very act of working. When the State refused to allow any mental patients to be assigned work between 1976 and 1977, the hospitals experienced a rise in the number of violent patient incidents, amount of tranquilizers prescribed, and the average patient stay.

---

**20.** This is not the only burden attached to the benefit. The State also requires patients with financial resources to pay for the cost of their care. Ind.Code § 16–14–18.1–3 (West Supp. 1990). Although article I, § 21 prevents the State from taking property without just compensation, plaintiffs do not argue that charging patients is an unconstitutional taking of property.

Record at 2375 & 1945. In addition, the staff noticed a general sense of confusion on the part of the patients about why they were no longer working. Record at 1981. The trial record contains many examples in which patients hospitalized between 1970 and 1974 progressed from a low-skill job within the institution to a paying job located off the hospital grounds. *See, e.g.,* Record at 1200–13, 1331–35, & 1947–48. The fact that work could benefit the plaintiffs in these ways makes the State's decision to work its patients all the more reasonable.[21]

The State's demand was also reasonable because it did not interfere with the plaintiffs' ability to earn a living. Because one of the purposes of the particular services clause is to protect a citizen's ability to earn a living, services that do not interfere with that ability have usually been characterized as general. *See, e.g., Webb v. Baird,* 6 Ind. 13; *Buchman v. State,* 59 Ind. 1; *Israel v. State,* 8 Ind. 467. Although the members of the plaintiff class worked a substantial number of hours over four years, the time spent working did not detract from their ability to earn a living.

### B. Plaintiffs Worked on the State's Demand

We have never before considered how coercive the State's request for services must be to become a "demand," but the U.S. Supreme Court's analysis of the type of coercion required to render servitude "involuntary" under the thirteenth amendment is instructive. We think a request becomes a "demand" when it is backed up with the use or threatened use of physical force or legal process which creates in the citizen a reasonable belief that he is not free to refuse the request. *See generally United States v. Kozminski,* 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988).

To establish that the State demanded work from the 7400 members in the class, the plaintiffs presented the testimony of eleven former mental patients and two expert witnesses. The 7400 plaintiffs were hospitalized in ten state mental hospitals. The eleven patients who testified at trial or through deposition offered the only evidence about the extent of coercion used to induce 7400 patients to work. Not one of the eleven witnesses ever refused to work, although many believed that other unidentified patients had done so with drastic consequences befalling them.[22] Nevertheless, under our forgiving standard of review, the trial court could have found that the State "demanded" work of the patients. The State clearly initiated the process of putting patients to work. With respect to involuntarily-committed patients, the State's requests were backed up with the use or threatened use of this legal process. A patient could reasonably believe that a refusal to work might result in a delayed release from the institution.[23] With respect to voluntary committees, the

---

21. The plaintiffs' evidence suggested that the State's procedures for diagnosing, assigning and supervising work were below the minimum medical standards and thereby rendered the work non-therapeutic. They presented evidence to show the patients had little contact with medical doctors, were not told why they should work, were coerced into accepting the work, had no on-the-job supervision from medical personnel, and did not perceive that they benefitted from their work. The State presented conflicting evidence to show that its procedures for assigning, encouraging, and supervising the patients' work met prevailing medical standards. This debate over prevailing medical standards does not detract from other uncontroverted evidence which shows that specific benefits resulted from the plaintiffs' work.

22. The testimony of one of the male plaintiffs is representative:

Q: If you refused to [work], what would have happened?
A: I would have been sent back to maximum security and placed in isolation.
Q: You were told this?
A: I was told that, let's say, directly and indirectly, many times during—I had been at the institution approximately a year at that point, and I had seen it happen many times when an individual refused to work, refused to do what he was told to do, he was either given drugs and put in isolation or one or the other.
Record at 1204.

23. A plaintiff who had been involuntarily committed testified that he was told by an unidentified person that he "had to work in order to gain [his] freedom." Record at 1200.

persistent rumors that disobedience of any kind was punished with a loss of privileges, isolation, and electric shock created a coercive atmosphere that reasonably led patients to believe that they were not free to refuse work.[24] Although there is *no* evidence that any patients were actually punished in these ways for refusing work, there is substantial evidence that rumors were persistent among the patient population. Considering the impaired mental condition of the plaintiffs and the extent of the State's control over the patients' lives, we think the evidence is adequate to establish a "demand" by the State.

### C. "Just Compensation"

Even if we had determined that the plaintiffs' work did constitute "particular services," the relief to which they would be entitled is "just compensation." This Court has never discussed how "just compensation" is to be measured under the particular services clause. There are many opinions, however, analyzing how "just compensation" is to be measured under the clause in § 21 which governs takings of property. Plaintiffs correctly note that both clauses use the same phrase:

> No person's particular services shall be demanded, without just compensation. No person's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered.

Ind. Const. art. I, § 21. Plaintiffs contend that "the phrase 'just compensation' must be construed consistently within Article I § 21...." Brief in Support of Plaintiffs–Appellees' Petition for Transfer at 14. Our case law supports this rule of constitutional construction. "The general rule is that the same words occurring at different places in a constitution will be given the same meaning unless the context requires a different meaning." *Kirkpatrick v. King* (1950), 228 Ind. 236, 246, 91 N.E.2d 785, 789. Thus, we will examine how "just compensation" is measured under the takings clause.

The convention delegates spent a good deal of the six days devoted to § 21 debating how to calculate "just compensation" for a taking of property. They debated two aspects of the compensation question: timing of payment and method of assessing damages. The delegates chose to change the timing of payment, deciding that before property could be taken compensation must be first assessed and tendered. 1 *Debates* at 430–31. By contrast, the delegates argued vehemently about the method of calculating just compensation and decided to retain the method as it had existed under the 1816 Constitution.

Indiana Supreme Court decisions on the method of assessing compensation followed a remarkably straight line. The Court consistently held that the 1816 Constitution required only that a claimant be paid the value of the property taken, plus the value of any damage done to the remaining property as a result of the taking, less the value of any benefits accruing to the remaining property as a result of the taking. *See, e.g., McIntire v. State* (1840), 5 Blackf. 384; *Digby v. State* (1841), 5 Blackf. 541; *Vanblaricum v. State* (1844), 7 Blackf. 209. The Court acknowledged that this was a proper measure of "just compensation" even in cases where the benefits conferred exceeded the damages:

> In ascertaining the extent of the injury, undoubtedly, an estimation of the value of the property taken, at the time of taking, is a necessary step; but if the benefits really and substantially resulting to the claimant, equal, in pecuniary value, the value of that of which the

---

**24.** A female plaintiff's testimony confirms that the fear of punishment for refusing work was common:

Q: Did [the hospital staff punish] patients when they did something bad or something they didn't want them to do?
A: Yes, sir.
Q: Do you know whether they [punished] anyone who refused to work?
A: I don't know, but I was scared not to do it.
Q: You saw it going on and didn't want to take any chances?
A: Right.
Record at 1354–55.

public has deprived him, we conceive they constitute a just and constitutional compensation for the deprivation to which he has been subjected; and such, in our opinion, is the nature of the benefits contemplated by the statute in question—the enhancement of the value of property by the construction of a public improvement.

*McIntire v. State,* 5 Blackf. at 387.

This method of using benefits to offset damage from the taking was frequently called the "extrinsic benefits rule." The Court noted that this had been the rule in Indiana since 18th century territorial days and said of those who drafted the 1816 Constitution's just compensation clause:

> [W]e can not doubt that its authors, in providing that "just compensation" should be made for private property taken for public use, designed to convey the meaning which had been attached to that phrase by the community for more than seventeen years, and which has since remained unquestioned for a longer period of time.

*Id.* at 386–87.

The decisions of Indiana's trial courts and of this Court on calculation of compensation under the 1816 Constitution were well known to some delegates and played a prominent role in the floor debates. Indeed, one delegate read portions of this Court's compensation decisions aloud on the floor. *Id.* at 360–61 (delegate Bright reading from *Rubottom v. McClure* (1838), 4 Blackf. 505, 507, 508–09).

Some delegates disliked this Court's interpretation of the 1816 Constitution on this point, and wanted new constitutional language to alter it. Delegate Bright declared: "The great evil under the provision in the old Constitution resulted from this mode of paying assessed damages." 1 *Debates* at 362. Bright cited a case in which the jury concluded that the benefit of a public improvement to an owner's adjacent land entirely offset the value of the land actually taken and awarded the owner

nothing; he called this "radically wrong." *Id.*[25] Bright asked the Convention to correct this wrong by adopting new language to alter the way "just compensation" was calculated: "No man's particular services shall be demanded, or property taken or applied to public use, against his consent, *without a just compensation in money, irrespective of extrinsic benefits, being made therefor.*" *Id.* at 361 (emphasis added). Bright's complaint about this meaning of the 1816 Constitution found many followers.

Other delegates favored retaining the 1816 language. They asserted two grounds. First, some delegates relied on what might be called today the "no-harm-no-foul" rule. Speaking about a farmer part of whose land might be taken by a public improvement, delegate Kilgore said that "if the value of the owner's farm is to be enhanced by it, the property taken can be nothing but an imaginary wrong to the owner." 1 *Debates* at 354. Particularly relevant to the instant case, delegate Barbour opposed Bright's amendment because it would require taxpayers to pay claimants whose extrinsic benefits exceeded their damages. 1 *Debates* at 373. Second, as in the debate over the 1816 term "particular services," there was sentiment in favor of simple continuity. Said delegate Kilgore:

> I suppose that there is not a single section in the old Constitution upon which there has been more litigation than upon the one now under consideration, and the decisions of the courts thereupon are well understood, so that now if we propose a radical change in this provision, it could not but operate prejudicially to all the interests of the State, except the interests of the individual who chooses to remain wholly unwilling to surrender anything for the public good.

1 *Debates* at 353.

■ Delegate Bright and others mounted repeated attempts to abolish the extrinsic benefit rule, but the convention repeatedly refused to do so and stood by the

---

**25.** There was in fact such a case, *Vanblaricum v. State* (1844), 7 Blackf. 209, though it was overturned on appeal and a new trial ordered.

language from 1816. *See, e.g.,* 1 *Debates* at 374. The courts have honored this decision. Twice since the adoption of the 1851 Constitution, this Court has held that § 21 maintained the extrinsic benefit rule as it existed in the 1816 Constitution. *Hagaman v. Moore* (1882), 84 Ind. 496, 500; *Indiana Central R.R. v. Hunter* (1856), 8 Ind. 74, 78.[26] If the State is constitutionally permitted to use extrinsic benefits conferred on a property owner to offset losses for property taken, the use of identical language in both clauses of § 21 compels application of the same principle when the State demands particular services. Thus, in calculating "just compensation" under the particular services clause, claimants are entitled to recover the value of the particular services rendered less the value of any benefits accruing to them as a result of their work.

*Value of the Services.* The trial court calculated the value of the patients' labor by multiplying the number of hours each patient worked by $1.60, the federal minimum hourly wage under the FLSA during the time the plaintiffs were working. Collectively, the patients worked around 8.7 million hours, putting the value of their work at nearly $14 million.

The FLSA, of course, did not apply to employees working in State mental hospitals. Thus, this minimum wage can serve only as evidence of the value of the plaintiffs' work. Whether the evidence supporting $1.60 per hour as the value of plaintiffs' work can be called "substantial" is open to doubt. The type of work performed by the patients was mostly low-skill, manual labor. All patient jobs were categorized by the patient remuneration board into thirteen basic types: dietary helper, maintenance helper, clothing room helper, and so on. Those jobs which required the most skill, like technical, clerical or maintenance helpers, employed few patients. For example, of the 376 patients who worked at Beatty Memorial Hospital in 1970, only eight worked as maintenance helpers, seven as technical helpers, and one as a clerical helper. The plaintiffs who testified at trial confirmed that their work was mostly low-skill manual labor. During the patient remuneration board's initial meetings in the early 1970's, it set the FLSA minimum wage as the *maximum* rate for patient work. The board planned to multiply this rate by a productivity percentage to arrive at a patient's final hourly wage rate. Thus, under the board's payment plan, a patient who was performing at a 50% productivity rate would be entitled to 50% of $1.60 per hour. This productivity discount is also contemplated under the FLSA. 29 U.S.C. § 214(c) (1988). Although there is little evidence in the record to suggest what specific productivity percentage should be used, it is apparent that plaintiffs were performing at a lowered productivity rate.

■ *Extrinsic Benefits.* In awarding just compensation under § 21, the value of the benefits conferred on the plaintiffs must be subtracted from the value of their work. The trial court allowed no offset although there was uncontroverted evidence of several benefits accruing to the plaintiffs. The first benefit from the patients' work was the improved environment in which the patients lived. Almost all of the plaintiffs performed work for the patient population. Each working plaintiff directly benefitted from the fact that an-

**26.** *See also Rassier v. Grimmer* (1891), 130 Ind. 219, 224, 28 N.E. 866 ("benefits enuring to the land by reason of the location of the highway equalled the damage caused by the easement imposed, and hence there was 'no damage'"). The legislature, of course, may order that compensation be paid in excess of this constitutional minimum. It has done just that in a variety of statutes governing acquisition of property. *See, e.g.,* 2 Ind.Rev.Stat. 193, § 711 (1852) (benefits accruing to remainder cannot be used to offset extent of the taking); 1905 Ind.Acts 59 (ch. 48, § 6) (codified at Ind.Code Ann. § 7685 (Burns 1926)); 1935 Ind.Acts 228 (ch. 76, § 3); 1982 Ind.Acts 1431–32 (Pub.L. No. 187, § 169) (benefits may be used only to offset damage to residue resulting from a taking by State or county for a highway or by a municipal corporation for public use) (codified as amended at Ind.Code § 32–11–1–6 (West Supp.1990)). The only statute ordering compensation above the constitutional minimum for services was the patient remuneration law. As we indicated above, it is not a basis for affirming the trial court's judgment.

other plaintiff was preparing food for his consumption, washing his clothes, and cleaning the floors of his ward.

The second benefit was the State's provision of food, shelter, and care for the members of the class. This benefit provided by the State was significant, valued at around $240 million at the time of trial as demonstrated in exhibits erroneously excluded by the trial court.[27] If they rendered particular services, the plaintiffs are entitled to just compensation—not a windfall. If they should have been paid for their work, then all of the direct benefits accruing to them as a result of this work must also be considered.

Although there is no direct evidence from which to calculate the exact worth of the first of these two benefits, it is apparent that the two combined exceed the value of the plaintiffs' labor.[28] Indiana's rule of constitutional law has been that where the value of extrinsic benefits exceeds the value of the property or services demanded, no cash compensation is due.

## V. Conclusion

Having rejected all six of the plaintiffs' grounds for recovery, we do not reach the subsidiary issues raised in the parties' briefs to this Court, such as the amount of attorneys fees awarded, the award of prejudgment interest, and the distinction between an award of damages and back wages. We reverse the judgment of the trial court and remand with instructions to enter judgment for the defendants on all counts.

DeBRULER, GIVAN and KRAHULIK, JJ., concur.

DICKSON, J., dissents with separate opinion.

DICKSON, Justice, dissenting.

I respectfully dissent from the majority opinion's analysis of the plaintiffs' claims under the Fair Labor Standards Act (FLSA) and those asserting violation of the state and federal constitutions.

### 1. Fair Labor Standards Act

The majority finds the issue of retroactivity determinative in rejecting the plaintiffs' claim that the Fair Labor Standards Act, 29 U.S.C. § 201, et seq., required the State to pay them for their work. Suit on this matter was originally filed in 1974 to secure compensation for labor performed for Indiana mental institutions from May 23, 1970, through December 31, 1974. The trial court entered judgment for the plaintiffs in 1987. At all of these times, the plaintiffs were within the protections of the FLSA by reason of its 1966 amendments extending coverage to employees of state hospitals and institutions for the residential care of the mentally ill. Fair Labor Stan-

---

**27.** The State sought to establish the amount of outstanding bills owed by each member of the class and called the reimbursement director of the Department of Mental Health, who was keeper of the original records. The State acknowledged that the evidence was not such proof as might be necessary to prove a counterclaim. Instead, it contended that if the trial court ultimately held that the class was entitled to recover under the patient remuneration law, it would necessarily need to know how much of the recovery should go to the patient and how much to the State for "charges of the hospital for maintenance, care, and treatment of the patient, to the extent of the actual charge." Record at 2210–13, 2221; 1971 Ind.Acts at 2127 (Pub.L. No. 474, § 4(d)). The trial judge sustained plaintiffs' objection to the State's exhibit, apparently believing that § 4 of the act entitled the patient to retain all of his earnings unless it could be proven that his unpaid hospital bill exceeded his earnings during each month he worked. Record at 2212. The act does not contain such a limitation and it was error to exclude the State's exhibit on this basis. While plaintiffs objected on other grounds, such as the fact that the exhibit contained summaries, their complaint is entitled only to modest attention in light of the nature of their own proof. Thousands of the hours in their claim are not supported by any evidence at all that the named patient worked; they are based on averages calculated from other patients. Plaintiffs' arguments about the meticulousness of the State's paperwork must be considered in light of the fact of plaintiffs' failure to plead their § 21 constitutional claim.

**28.** The $240 million due the State included charges for care rendered to patients for years outside the 1970–74 period at issue. This evidentiary difference might be material if the value of the extrinsic benefits were not eight times the value of the services.

dards Amendments of 1966, Pub.L. No. 89–601 §§ 102(a), (b), and (c), 80 Stat. 830, 831 (codified as amended at 29 U.S.C.A. §§ 203(d), (r) and (s)(5)(1978). The application of the FLSA to government hospitals was ruled to be within Congress' power under the Commerce Clause. *Maryland v. Wirtz* (1968), 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020. In June of 1976, the United States Supreme Court reversed *Wirtz* and voided the application of the FLSA to government employees engaged in traditional governmental functions. *National League of Cities v. Usery* (1976), 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245. However, the Court subsequently reversed itself again, and expressly overruled *National League of Cities*, thus reinstating *Wirtz*. *Garcia v. San Antonio Metro. Transit Auth.* (1985), 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016.

In order to reverse the trial court, the majority opinion gives retroactive application only to *National League of Cities* but denies *Garcia* a parallel application. The majority attempts to justify this inconsistency by finding *Garcia* non-retroactive under the three-factor test enunciated in *Chevron Oil Co. v. Huson* (1971), 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296. The usual rule is that cases should be decided in accordance with the law existing at the time of decision unless consideration of the three *Chevron* criteria requires nonretroactive application. *Goodman v. Lukens Steel Co.* (1987), 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572. In the present case, the law existing at the time of the decision was that of *Wirtz* and *Garcia* recognizing the constitutional validity of the FLSA provisions which applied minimum wage requirements to protect certain state government employees, including the plaintiffs.

In order for the first *Chevron* factor to support a claim of nonretroactivity, the *Garcia* decision must not only overrule clear past precedent, which it did in reversing *National League of Cities*, but also must such precedent be one "on which litigants may have relied." *Chevron*, 404 U.S. at 106, 92 S.Ct. at 355, 30 L.Ed.2d at 306. A major weakness of the majority's rationale is its finding that the reliance

element was met by the State's failure to seek a declaratory judgment after 1976 when *National League of Cities* was decided. Despite the majority's conjecture as to the State's possible reliance upon *National League of Cities* following 1976, the inescapable fact remains that during 1970 to 1974, when the plaintiffs were providing labor without any compensation, the then-existing law entitled them to the minimum wage protections of the FLSA, and the State could not have then relied upon *National League of Cities* which was not decided until 1976. Absent such reliance, the first *Chevron* factor cannot support the refusal to give *Garcia* the customary retroactive application.

The second factor favoring nonretroactivity requires an analysis of "the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Chevron*, 404 U.S. at 107, 92 S.Ct. at 355, 30 L.Ed.2d at 306. Here the "rule in question" is the *Garcia* holding that the FLSA wage and hour provisions, as applied to state and local governments, are not violative of any constitutional provision. I cannot subscribe to the majority's view that retroactive application, permitting the enacted protections of the FLSA for state workers, would retard the purpose and effect of the minimum wage provision. The contrary is true.

As to the third *Chevron* factor, the majority opines that retroactive application of *Garcia* would produce substantial inequitable results because of the failure of a contemporaneous suit for FLSA benefits. In *Brennan v. Indiana* (7th Cir.1975), 517 F.2d 1179, *rev'd sub nom, Indiana v. Usery* (1976), 427 U.S. 909, 96 S.Ct. 3196, 49 L.Ed.2d 1202, the plaintiffs were paid employees of the Indiana Department of Mental Health seeking overtime pay under the FLSA. In finding "substantial inequitable results" between the patients and the staff of the hospitals, the reasoning of the majority is flawed in two respects. First, the plaintiffs in *Brennan* suffered an untimely dismissal following appellate reversal because the intervening *National League of*

*Cities,* since overruled, was retroactively applied to reverse their favorable judgement. But such an unfortunate and (absent *National League of Cities* ) erroneous result for the hospital employees in *Brennan* does not necessarily compel an additional erroneous decision for the present plaintiffs. Two inequities are more substantial than one. Second, the level of harm suffered by the plaintiffs in the present case differs dramatically from that suffered by the plaintiffs in *Brennan.* In the latter instance, the employees were at least paid basic wages, and were deprived only of their claim for overtime compensation. The present plaintiffs received no wages whatsoever for their labors, and now seek at least the federally mandated minimum wage. Permitting the patient/workers to be denied all compensation for a period during which regular employees were paid basic wages but denied overtime benefits does not constitute the "substantial inequitable results" necessary for the third *Chevron* factor. Thus, *Garcia* should not be deprived of its retroactive application.

The majority finds "compelling" the eventual outcome in *Garcia.* I disagree. The plaintiff in *Garcia* was seeking application of the FLSA for labor performed *after* the 1976 decision in *National League of Cities,* when the San Antonio Metropolitan Transit Authority (SAMTA) notified its employees that it would no longer abide by the FLSA's maximum hours and overtime provisions. In fact, SAMTA obtained a declaratory judgment that its public mass transit system was protected from federal regulation following *National League of Cities.* Thus in refusing to comply with the FLSA, SAMTA was acting in reliance upon both the Supreme Court's 1976 decision in *National League of Cities* and the subsequent declaratory judgment. It is little wonder that, following remand from the Supreme Court, it was determined that SAMTA "was relying on the general framework provided by *National League of Cities,* as it undoubtedly had a right to do." *Garcia v. San Antonio Metro. Transit Auth.* (5th Cir.1988), 838 F.2d 1411, 1418. Although finding the first prong of

*Chevron* to require nonretroactive application of *Garcia,* the federal circuit court indicated its agreement with the trial court's finding that the second *Chevron* factor neither favors nor opposes retroactive application of *Garcia.* 838 F.2d at 1418–19. In reviewing the third *Chevron* factor, the court found that the equities favored nonretroactivity, noting that

First, huge back-pay awards may very likely cripple the always closely budgeted municipal funds. There is a great difference between, on the one hand, knowing you are subject to a regulation, planning for it and taxing and charging the public for it all along, and, on the other hand, suddenly finding out that, contrary to precedent of the Supreme Court and the decisions of the district court, you have been subject to a regulation for several years and are required to compensate under that regulation for previous years for which tax monies have already been otherwise allocated and spent. Of course, the municipalities and the taxpayers have in some ways benefitted from their exemption from the FLSA. However, the equities do not justify saddling them with huge back-pay liabilities *when they acted in good faith during all those years, believing for substantial precedential reasons that they were exempt from the FLSA,....*

*Garcia,* 838 F.2d at 1420 (emphasis added). The second reason given was that overtime compensation to SAMTA employees was at least presumptively partially received in other forms because SAMTA "must compete for labor in the marketplace against employers who are subject to the FLSA, and so it could not simply subtract the benefits required by the FLSA from its own programs." *Id.* Neither of these equitable considerations has any application to the present plaintiffs. Unlike SAMTA, the State of Indiana obtained the plaintiffs' labors before *National League of Cities* was decided. Because the then-prevailing law would have entitled the patient/workers to FLSA protection, the State cannot be said to have "acted in good faith during all those years, believing for substantial prece-

dential reasons that they were exempt from the FLSA" as they allocated closely budgeted government resources. The second SAMTA equitable consideration is likewise unavailable in the present case. The State of Indiana was obviously not competing for the patients' labor "in the marketplace against employers who are subject to the FLSA." Rather, the patients literally constituted a captive labor force. For these reasons, while the *Chevron* analysis permitted SAMTA, in good faith reliance upon *National League of Cities*, to avoid paying overtime benefits after 1976, it does not justify the refusal of the State of Indiana to pay FLSA minimum wage benefits to the present plaintiffs for work demanded and obtained in the absence of such reliance.

The better reasoning, which finds that the *Chevron* test requires retroactive application of *Garcia* to reinstate FLSA protections for the plaintiffs, is additionally bolstered by the principle that the party seeking to avoid retroactive application of a decision bears the burden of persuasion. *Ackinclose v. Palm Beach County* (11th Cir.1988), 845 F.2d 931, 933. The State has wholly failed in its burden of persuasion as to any of the three *Chevron* criteria. For these reasons, I respectfully dissent from part II(C) of the majority opinion.

### 2. Involuntary Servitude

I am likewise unable to join the majority's analysis of the plaintiffs' claim for damages resulting from their involuntary servitude in violation of the Thirteenth Amendment to the Constitution of the United States and Article 1, Section 37 of the Constitution of Indiana. Noting that the plaintiffs' claim here attacks a system of compulsory labor, the majority recognizes that suit may be brought directly under the Thirteenth Amendment, but finds that the nature of the plaintiffs' compulsory service falls within a "civic duty" exception permitting governments to compel citizens to perform certain civic duties such as jury service, military service, and road work.

In contrast, several other jurisdictions have found otherwise. *Weidenfeller v. Ki-*

*dulis* (E.D.Wis.1974), 380 F.Supp. 445 (forced labor of certain individuals, including the mentally disabled, amounts to involuntary servitude and therefore is violative of Thirteenth Amendment); *Stone v. City of Paducah* (1905), 120 Ky. 322, 86 S.W. 531 (compelling labor from persons confined as "idiots, insane persons, and inebriates" would be involuntary servitude in violation of the Thirteenth Amendment); *Downs v. Dept. of Public Welfare* (E.D.Pa. 1973), 368 F.Supp. 454 (forced labor at state mental hospitals may be violation of Thirteenth Amendment); *Johnston v. Ciccone* (W.D.Mo.1966), 260 F.Supp. 553 (forced work by confined mental patient without compensation would violate Thirteenth Amendment); and *Jobson v. Henne* (2d Cir.1966), 355 F.2d 129 (inmate of state mental institution entitled to trial on claim that compulsory work allegedly constituted involuntary servitude).

Therefore, I do not share the majority's conviction that the facts of the present case "fit squarely" within the civic duty exception. The requirement of extended full-time work was not imposed upon all citizens equally. Rather, I find it more reasonable to conclude that the nature and extent of labor compelled from the plaintiffs was far beyond "civic duties" and amounted to an actionable violation of the constitutional proscriptions against involuntary servitude.

### 3. Right to Just Compensation for Demanded Services

I further dissent from the majority opinion's analysis of the plaintiffs' claim under Article I, Section 21 of the Constitution of Indiana, which provides, in part:

No person's particular services shall be demanded, without just compensation.

The majority correctly recognizes that the evidence at trial was adequate to establish that the plaintiffs' uncompensated labor was demanded by the State, but finds that the plaintiffs' work did not constitute "particular services" and that the plaintiffs were not denied "just compensation."

The majority recognizes that the plaintiffs were required to work full-time jobs

as kitchen workers, groundskeepers, barbers, maintenance workers, secretaries, launderers, mechanics, hospital workers, and janitors, but finds that such work did not constitute "particular services" under the constitutional provision. Critical to the majority's resolution of this issue is its belief that in choosing the phrase "particular services" rather than "personal services," the 1850–51 Indiana Constitutional Convention necessarily intended to create no new rights to compensation which had gone historically uncompensated.

Such was not the view of this Court just three years after the convention debates upon which the majority relies. In *Webb v. Baird* (1854), 6 Ind. 13, there was no apparent hesitation in declaring that a pre-convention (1843) statute authorizing courts to assign counsel to gratuitously defend paupers would fall to § 21 should a conflict be presented. In addressing whether the 11-year-old statute could require an attorney's services to defend a pauper without any reward in the face of the newly re-adopted § 21 of the Constitution of Indiana, the Court declared: "the inferior law must yield to the superior," and found the constitutional provision would not allow courts to assign attorneys to defend poor persons for free, an obligation existing prior to the 1850–51 Convention. Thus, contrary to the majority's assertion, prevailing Indiana jurisprudence at the time of adoption of § 21 included a willingness to "create new rights to compensation for services provided to the state that had gone historically uncompensated."

Furthermore, the majority's treatment of "particular services" fails to sufficiently recognize that such phrase was utilized to identify services not equally required of all citizens. In 1856, this Court rejected an argument that witness fees constituted "particular services" which may not be constitutionally demanded without just compensation for the reason that such services were equally required of every citizen.

[B]ut we are prepared to say, that the services of witnesses in criminal cases are not particular, but are of the class of general services which every man in community is bound to render for the gener-

al, as well as his own individual good. It is as much the duty and interest of every citizen to aid in prosecuting crime, as it is to aid in subduing any domestic or foreign enemy; and it is equally the interest and duty of every citizen to aid in furnishing to all, high and low, rich and poor, every facility for a fair and impartial trial when accused; for none is exempt from liability to accusation and trial. These are matters of general interest and public concern,—are vital, indeed, to the very existence of free government, and render the services of witnesses on such occasions matters of general public interest, and not particular, in the sense of the constitution.

*Israel v. State* (1856), 8 Ind. 467, 468. The plaintiffs call our attention to the comments of Mr. Clark, which included:

I take it that the word *particular*, in the old Constitution means, not that general service which every citizen is bound to render, but something specific—something that is required of him as an individual, in contra-distinction to what is required, generally, of all citizens.

*1 Debates In Indiana Convention of 1850*, at 359 (1935) (emphasis in original). Others expressed similar views during the convention. For example, Mr. Niles stated:

I prefer the old word *particular* to the word *personal* used by the committee, as it will distinguish between such services and those general services which all good citizens owe to the State in protecting the interests and preserving the good order of society.

*Id.* at 368 (emphasis in original). Likewise, Mr. Clark added:

There are duties which *all* citizens are occasionally called on to perform; services which the necessities of the State demand *alike from all;* obligations which *all* citizens owe to their government, the common defense of all.

*Id.* at 371–2 (emphasis added).

Working at the state's mental institutions was not required of all citizens. The labor of patient/workers was not demanded for merely a few days each year. Rath-

er the state required, without compensation, plaintiffs' full-time work during much of their confinement at a mental institution. Such demand should be viewed as falling within the "particular service" which our Constitution prohibits without just compensation.

I find particularly unfortunate the majority's rationale for finding that the plaintiffs' right to just compensation is precluded by inferred extrinsic benefits.

From its review of the convention debates resulting in the inclusion of § 21 in the 1851 Indiana Constitution, the majority concludes that extrinsic benefits are constitutionally permitted when assessing damages for the taking of a person's property without just compensation, and that parallel application requires that extrinsic benefits also be considered in determining damages for a person's particular services demanded without just compensation. But application of this conclusion to the present facts does not compel the result reached by the majority.

In the instance of claims seeking just compensation for *property* taken by law, extrinsic benefits are considered to the extent that the pecuniary value of a *person's remaining property* is enhanced. Such a claim for just compensation is not reduced because of general, non-pecuniary enhancements in "improved environment." Parallel application to claims seeking just compensation for *particular services* demanded by law would require that the extrinsic benefits to be considered are restricted to the pecuniary benefits to the *person's remaining services*, and not improved environment. Thus if the manner of using the demanded labor resulted in increased marketable skills or experience thereby conferring an enhanced value upon the patient/worker's particular services, or labor skills, such extrinsic benefits could be considered in determining damages for just compensation. But there should be no reduction for general, non-pecuniary enhancements in improved environment. The State does not argue that the evidence demonstrates a pecuniary enhancement of the value of plaintiffs residual labor skills.

Therefore there is no proper basis to conclude that plaintiffs have already received "just compensation."

The proper use of benefits in determining "just compensation" was thoroughly reviewed and, to the extent possible, resolved in *State v. Reid* (1933), 204 Ind. 631, 185 N.E. 449. Following a review of existing precedent, speeches of the various delegates at the constitutional convention, and the action of the General Assembly the following year when it passed an act preventing the consideration of extrinsic benefits, the *Reid* court concluded:

> We consider the just compensation clause to be primarily a restriction on the power of the legislature for the protection of private property. It is not a specific rule to measure the amount of damages, and we believe there is a margin of discretion for courts and legislatures in determining what specific rules should be adopted to insure just compensation. In view of the obvious margin of uncertainty inherent in any effort to estimate money value of benefits we cannot say, as a matter of law, that the requirement of "just compensation" will not be attained more often by a rule excluding benefits than by a rule requiring benefits to be considered. On the other hand we could not say, as a matter of law, that the legislative rule requiring benefits to be considered would violate the "just compensation" clause.

204 Ind. at 638, 185 N.E. at 451–52. We need not revisit history and alter this considered analysis. Whether extrinsic benefits are to be included in determining "just compensation" under § 21 is thus a matter for legislation. When the plaintiffs' particular services were demanded in 1970–1974, just such a legislative policy determination existed in the Patient Remuneration Act, which the majority declines to enforce in part II(B) of its opinion. Absent legislative determination, extrinsic benefits are not a necessary constitutional component of "just compensation."

Furthermore, the majority opinion inappropriately presumes from a silent record that the State proved extrinsic benefits

which exceeded the value of the compelled particular services rendered by the plaintiffs, apparently relying upon evidence "offered to show existing amounts due for the cost of care and maintenance of a substantial number of the individual plaintiffs." Brief of Appellants to the Court of Appeals at 87. This evidence was excluded by the trial court. On appeal, the defendants complained of its exclusion only with respect to the plaintiffs' claims under the Patient Remuneration Act, not as to any other of plaintiffs' claims. Brief of Appellants to the Court of Appeals at p. 4. I cannot agree with the majority's declaration that said evidence was erroneously excluded or its belief that such provides a basis to reverse the trial court and enter judgment for the State.

This is not to suggest that I oppose consideration of proper claims which the State may have in the event of unpaid accounts resulting from services rendered for the State's provision of food, shelter and care for members of the class. Our legal system provides an appropriate mechanism for such claims to be asserted and proven at trial. However, in this appeal the State does not contend that trial court error prevented it from the legitimate presentation of such claims except as to claims under the Patient Remuneration Act. The State filed a counterclaim (Record at 156) but withdrew it before trial (Record at 406–7). The contents of counterclaim are not disclosed in the record.

For most of four years, the plaintiffs' coerced labor was provided for our state mental institutions without wages or other demonstrated compensation. In what we proudly call the Bill of Rights in the Indiana Constitution, § 21 unequivocally declares that a person's particular services shall not be demanded without just compensation. And § 12 of the Bill of Rights assures that every person shall have remedy by due course of law. The plaintiffs have asked the courts to recognize their constitutional right to just compensation and to afford a remedy. With today's decision this Court, with dubious regard for due course of law, relies upon unadmitted evidence and implements an unasserted af-

firmative defense to deprive the plaintiffs of the just compensation to which they were found entitled by both the trial court and the Court of Appeals. I share my colleagues' apparent regard for the magnitude of the award and its fiscal impact upon the state treasury. However, such award also reflects the magnitude of the aggregate loss resulting from the compelled labor extracted from the plaintiffs. Concern for the former cannot justify disregard of the latter.