**Fred A. RISSER and David M. Travis, Plaintiffs–Appellants,**

v.

**Tommy G. THOMPSON, Defendant–Appellee.**

**No. 90–3119.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1991.

Decided April 16, 1991.

Rehearing and Rehearing En Banc Denied May 17, 1991.

**550**

Frederick B. Wade, Madison, Wis., for plaintiffs-appellants.

Edward S. Marion, Wisconsin Dept. of Health & Social Services, Office of Legal Counsel, Madison, Wis., for defendant-appellee.

Before WOOD, Jr. and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

The constitution of the State of Wisconsin has since 1930 provided that "appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law," Art. V, § 10(1)(b), unless the veto is overridden by a two-thirds vote in each house of the legislature; in that event the bill becomes law in the form in which the legislature had originally approved it. § 10(2)(b). Many states have partial-veto provisions of this general type (Chester James Antieau, *The Executive Veto* 36 (1988)); and under the name "line-item veto" the policy of these provisions has repeatedly been urged upon the Congress of the United States. What is unique about Wisconsin, however, is that the courts of that state have read the words "in part" literally. By doing so they have empowered the governor not only to delete particular appropriations (line items), but also to delete phrases, words (such as "not")—even individual letters and digits— within an individual item or provision, and to do so even if the effect is to create a law

remote from the legislators' intentions. *State ex rel. Wisconsin Telephone Co. v. Henry,* 218 Wis. 302, 260 N.W. 486 (1935); *State ex rel. Wisconsin Senate v. Thompson,* 144 Wis.2d 429, 424 N.W.2d 385 (1988). Last year the Wisconsin constitution was amended to provide that "in approving an appropriation bill in part, the governor may not create a new word by rejecting individual letters." Art. V, § 10(1)(c). But he remains free to delete phrases, words, and digits. Governor Thompson, a Republican, has used this power to modify numerous provisions in appropriations bills enacted by the legislature, both houses of which are controlled by the Democrats. Many of these provisions have nothing to do with appropriations. For often the legislature will attach substantive amendments to the omnibus appropriations bill that is the principal legislative initiative in each session, and the governor will use his power of partial veto to change the meaning of those provisions.

Two Democratic legislators sue the governor for a declaration that the partial veto provision of the Wisconsin constitution, as interpreted by the Wisconsin courts, violates the clauses of the federal Constitution that guarantee free speech, due process of law, equal protection of the laws, and a republican form of (state) government. The plaintiffs also seek an injunction against the governor's using the provision in the future and an order nullifying past legislation created by the use of the provision. The district court dismissed the suit on the governor's motion for summary judgment.

■ We must first consider whether the plaintiffs have standing to maintain this suit. They argue that since the Democrats do not have two-thirds control of both houses of the Wisconsin legislature, the partial veto provision reduces the voting power of Democratic legislators such as themselves. *Coleman v. Miller,* 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385 (1939), holds that state legislators do indeed have standing to challenge measures that diminish the effectiveness of their votes, by analogy to the right of a private citizen to maintain a

tort suit for deprivation of his right to vote. *Ashby v. White*, 2 Ld. Raym. 938, 92 Eng. Rep. 126 (K.B. 1703); *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927). The applicability of *Coleman* to congressional standing was, it is true, questioned in Judge (now Justice) Scalia's concurring opinion in *Moore v. U.S. House of Representatives*, 733 F.2d 946, 957–61 (D.C.Cir.1984), and in Judge Bork's dissenting opinion in *Barnes v. Kline*, 759 F.2d 21, 50, 62–63 (D.C.Cir.1985), vacated as moot under the name *Burke v. Barnes*, 479 U.S. 361, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987), on the ground that judicial intervention in disputes between Congress and the President threatens to disrupt the separation of powers that the Constitution ordains. But neither judge questioned the continued vitality of the *Coleman* decision within its original domain, that of suits by *state* legislators. We shall see that the federal Constitution does not prescribe any particular separation of powers within state government, so that the concerns expressed by Judges Bork and Scalia cannot arise in a case in which a state legislator sues the state's executive or judiciary. Yet there is much in these opinions that strikes at the heart of *Coleman*—such as Judge Scalia's distinction between the rights of an individual (for example, his right to vote) and "the powers of an office," which "belong to the people and not" to the office holder. 733 F.2d at 959. See also *Thornton v. Barnes*, 890 F.2d 1380, 1392 (7th Cir.1989) (concurring opinion). Ordinarily, a person lacks standing to complain about the deprivation of something in which he has no legally protected interest.

However all this may be, no court has yet concluded that *Coleman* should be regarded as defunct, *Chiles v. Thornburgh*, 865 F.2d 1197, 1205 (11th Cir.1989), and we are naturally timid about overruling decisions of the Supreme Court. *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731 (7th Cir.1986); C. Steven Bradford, "Following Dead Precedent: The Supreme Court's Ill–Advised Rejection of Anticipatory Overruling," 59 *Fordham L. Rev.* 39 (1990). It will not pay, though, to pursue the question further in this case,

which was in any event rightly dismissed. To begin with, the suit is against the wrong defendant. Legislators' immunity is absolute, *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), and extends to injunctive as well as to damages suits. *Supreme Court v. Consumers Union*, 446 U.S. 719, 732–33, 100 S.Ct. 1967, 1974-75, 64 L.Ed.2d 641 (1980). When the governor of a state is exercising his veto power, he is acting in a legislative capacity, *Edwards v. United States*, 286 U.S. 482, 490–91, 52 S.Ct. 627, 630, 76 L.Ed. 1239 (1932); *State ex rel. Wisconsin Senate v. Thompson, supra*, 144 Wis.2d at 454–55, 424 N.W.2d at 395; *Rateree v. Rockett*, 852 F.2d 946, 951 (7th Cir.1988) (dictum), and he is therefore entitled to absolute immunity. Cf. *Hernandez v. City of Lafayette*, 643 F.2d 1188, 1193 (5th Cir.1981). The proper defendants in this suit would be officials or others enforcing or relying upon the laws created in the manner that the plaintiffs claim is unconstitutional. But it would be pointless for us to affirm the dismissal of the suit on the basis of the governor's immunity. That would just lead to the suit's being refiled against the proper defendants. We are persuaded that the suit has no possible merit, and we therefore do not wish to make the parties jump through another hoop. Since immunity even when absolute is a defense to a suit rather than a denial of the court's jurisdiction, we are not obliged to stop with a ruling that the defense is available in this suit.

A number of provisions of the federal Constitution assume that states have branches much like those of the federal government. Art. I, § 2 (cls. 1, 4), § 3 (cl. 1—since superseded by the Seventeenth Amendment), § 4 (cl. 1); Art. II, § 1 (cl. 2); Art. IV, § 3 (cl. 1), § 4; Arts. V and VI (cl. 3); Amend. XIV, §§ 2, 3; Amend. XVII. Some provisions even assign specific duties to specific branches of state government. For example, Art. I, § 4, cl. 1 provides that each state legislature shall prescribe the time, place, and manner of electing the state's U.S. Senators and Representatives. But in a series of decisions on which the plaintiffs do not deign to comment, we

have held that the Constitution does not require a state to imitate the separation of powers prescribed for the federal government by the Constitution. It therefore does not require a state to allocate powers among the branches of state government in the same manner in which the Constitution prescribes that allocation among the branches of the federal government. *Chicago Observer, Inc. v. City of Chicago,* 929 F.2d 325, 328–329 (7th Cir.1991); *United Beverage Co. v. Indiana Alcoholic Beverage Comm'n,* 760 F.2d 155, 158 (7th Cir. 1985); *Alleghany Corp. v. Haase,* 896 F.2d 1046, 1053 (7th Cir.1990), vacated as moot under the name *Dillon v. Alleghany Corp.,* —— U.S. ——, 111 S.Ct. 1383, 113 L.Ed.2d 441 (1991); *Falls v. Town of Dyer,* 875 F.2d 146 (7th Cir.1989); *Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 469 (7th Cir.1988); *Ware v. Gagnon,* 659 F.2d 809, 812 (7th Cir.1981).

These decisions, well grounded as they are in decisions by the Supreme Court, *Dreyer v. Illinois,* 187 U.S. 71, 83–84, 23 S.Ct. 28, 32, 47 L.Ed. 79 (1902); *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 225, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908); *Mayor v. Educational Equality League,* 415 U.S. 605, 615 and n. 13, 94 S.Ct. 1323, 1330 and n. 13, 39 L.Ed.2d 630 (1974); *Whalen v. United States,* 445 U.S. 684, 689 n. 4, 100 S.Ct. 1432, 1436 n. 4, 63 L.Ed.2d 715 (1980), put these plaintiffs out of court. The effect of the partial veto provision in the Wisconsin constitution, as the provision has been interpreted, is to give the governor greater power over the appropriations process than he would have if he had a simple veto power or even a line-item veto power, that is, a power to veto particular appropriations without having to veto the entire omnibus appropriations bill and thereby bring state government to a grinding halt. It is true that the present governor frequently exercises his partial veto power on nonappropriations items. But that is because the legislature chooses—for reasons unilluminated by the record of this case, but no doubt founded on considerations of legislative gamesmanship rather than on some edifying concept of the public interest—to attach substantive provisions as riders to the omnibus appropriations bill. If the legislature stops doing this, the governor's "creative" veto power will be limited to appropriations matters.

It is not even certain that the partial veto power makes the governor of Wisconsin more powerful than the governors of other states. The litigants have not informed us about any aspect of the separation of powers in Wisconsin or any other state other than the partial veto power itself. Maybe when all the checks and balances in Wisconsin's government are taken into account, the state's governor is weaker than the governor of some or even many other states. But if he is stronger, still it does not follow that Wisconsin is violating the Constitution of the United States. The Constitution does not prescribe the balance of power among the branches of state government.

■ This conclusion is not altered by considering the specific constitutional provisions invoked by the plaintiffs. The clause guaranteeing to each state a republican form of government has been held not to be justiciable, *Pacific States Tel. & Tel. Co. v. Oregon,* 223 U.S. 118, 148–51, 32 S.Ct. 224, 230–31, 56 L.Ed. 377 (1912); *Baker v. Carr,* 369 U.S. 186, 218–26, 82 S.Ct. 691, 710–15, 7 L.Ed.2d 663 (1962); *Highland Farms Dairy, Inc. v. Agnew,* 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937); *United Beverage Co. v. Indiana Alcoholic Beverage Comm'n, supra,* 760 F.2d at 158, and although this result has been powerfully criticized, for example in John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 118 n.* (1980), it is too well entrenched to be overturned at our level of the judiciary. Even if the clause were justiciable, these plaintiffs would lose. A government is not monarchical or aristocratic merely because its chief executive is empowered to cross out words in an appropriations bill. In analogizing the governor of Wisconsin to the kings of England, and the legislature of Wisconsin to the Parliaments that struggled against royal prerogative in the eighteenth century, the plaintiffs merely give analogy a bad name. Maybe, though, "re-

publican form of government" signifies more than the absence of a monarch or an aristocracy vested with powers of government. On this the historical record is unclear. John Adams said late in life that "the word *republic* as it is used, may signify anything, everything, or nothing," insisted that he "never understood" what the guarantee of republican government meant, and added: "I believe no man ever did or ever will" (quoted in William Wiecek, *The Guarantee Clause of the U.S. Constitution* 13 (1972)). But James Madison, in *The Federalist No. 39,* had defined "republic" as "a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their office during pleasure, for a limited period, or during good behavior." Suppose that Madison's understanding of the clause was right, and Adams's skepticism undue. It would make no difference in this case, even if the guarantee clause created rights upon which a lawsuit could be based. Not only is Wisconsin's governor not a hereditary prince; neither is he a dictator. He is an elected official, just as the plaintiffs are. Madison's interpretation was a flexible one; in *The Federalist No. 43* he said that the states could "choose to substitute other republican forms" for those existing when the Constitution was enacted, "the only restriction" being "that they shall not exchange republican for anti-republican Constitutions." Wisconsin has not done that. A modest shift of power among elected officials is not a denial of republican government or even a reduction in the amount of democracy.

■ The plaintiffs' First Amendment claim is based on the idea that the people of Wisconsin can be said to speak, in a sense, through their legislators; and the effectiveness of their speech—not to mention the plaintiffs', the legislators', own speech—is reduced if the legislature must muster a two-thirds vote to prevent the governor from using his partial veto to create what is often, in effect, a new enactment. But the people "speak" through their governor in the same sense and to the same extent as they do through their legislators. If the legislators' freedom of speech is somehow impaired when their legislative power is diminished, then there must be an equal and offsetting increase in the governor's freedom of speech when his legislative power, exercised through the veto, is enlarged.

And all this assumes that freedom of speech is enlarged or contracted by rules allocating voting power. The assumption equates voting to speech; yet "the right to vote, per se, is not a constitutionally protected right," *Rivera-Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 9, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982), and the right to speak is. Of course, in a practical sense the power of one's speech can indeed be augmented or diminished by voting power. But it can also be augmented or diminished by money. There is something amiss in a mode of constitutional argumentation that derives a right to a redistribution of income and wealth from the free-speech clause. Cf. *Parker v. Merlino,* 646 F.2d 848, 855–56 (3d Cir.1981); *Davids v. Akers,* 549 F.2d 120, 123–24 (9th Cir.1977). It is another example of analogy gone wild.

■ The plaintiffs' equal protection argument is based on an analogy to the reapportionment cases, such as *Baker v. Carr, supra,* and *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The partial veto when exercised in a "creative" fashion is said to dilute the voting power of the plaintiffs' and other legislators' electors. This argument proves too much. It proves, what no one believes, that *all* gubernatorial vetoes, not just partial ones, violate the equal protection clause. It proves—contrary to *Gordon v. Lance,* 403 U.S. 1, 5–7, 91 S.Ct. 1889, 1891–93, 29 L.Ed.2d 273 (1971)—that all supermajoritarian voting requirements (which is what a veto is) violate the clause. The reapportionment cases require that each elector have the same voting power, as measured by the number of votes required to elect each elected state official. Maybe—though this we certainly need not decide—those cases could be extended to require that each elected *representative,* as distinct

from each *voter* for a representative, have one vote in the representative's house of the legislature, lest the apportionment of the legislature be set at naught by a maldistribution of voting power within the legislature. Cf. *Board of Estimate v. Morris*, 489 U.S. 688, 698, 109 S.Ct. 1433, 1440, 103 L.Ed.2d 717 (1989). But what the cases clearly do not speak to is the issue of the allocation of power between two branches of government both of which are elected. All that the creative veto power does is shift power from one properly apportioned elected body, the legislature, to another, the governor. There is no inequality. On the contrary, the governor is the only perfectly apportioned official in a state, since no two legislative districts have exactly the same number of voters.

 But the plaintiffs' own liberty, they argue, is impaired by the partial veto, which prevents them from reaping the fruits of their membership in the majority bloc and does this for no good reason. In so arguing they appeal to the concept of substantive due process. They argue that the power that a public official has by virtue of his office is a form of "liberty" within the meaning of the due process clause, so that to curtail the official's power is to curtail his liberty. This we greatly doubt; it is an inversion of the constitutional policy of protecting the citizen from government to treat the governmental power of an official as an aspect of his personal liberty that the courts are bound to protect. And for reasons explained in *Schroeder v. City of Chicago*, 927 F.2d 957, 961–62 (7th Cir.1991), we believe that to use the clause to complain of substantive rather than procedural deprivations, a plaintiff must be able to point to a right that is enumerated in the Constitution or at least suggested by one or more of the enumerated rights.

But if, despite what we have just said, the curtailment of a legislator's influence can, if arbitrary in the sense of irrational, vicious, or wholly unjustifiable, be deemed a denial of due process, the plaintiffs still must lose. Wisconsin's partial veto provision is not arbitrary in that sense. It enables the governor to strike appropriations items, to reduce appropriations by striking digits, and to cripple substantive items attached to appropriations bills by striking words and phrases. It thus empowers him to confine appropriations bills to appropriations matters, to exercise a line item veto as conventionally understood, and to reduce appropriations. So far—surely—so good. When, however, he uses the partial veto power to create a law that the legislature did not consider, let alone enact, then, we grant, he goes beyond the veto power as conventionally understood. But from a practical standpoint all that is involved is the governor's having been given a limited legislative power subject to veto by the legislature—a power exercisable only so long as the legislature insists on attaching substantive riders to appropriation bills. That governors have *some* legislative power is the premise of any gubernatorial veto power. Their legislative power is greater or smaller depending on the precise scope of the veto power. Wisconsin's partial veto provision as interpreted by the state's highest court is a rational measure for altering the balance of power between the branches. That it is unusual, even quirky, does not make it unconstitutional. It violates no federal constitutional provision because the federal Constitution does not fix the balance of power between branches of state government. Far from providing that no part of the legislative power of the state shall be assigned to executive or judicial officials, the Constitution assigns some federal legislative power to the federal executive, through its veto provision. Wisconsin has decided to proceed further down this road. At the end of that road lies rule by executive decree, with no legislature at all. Such rule might place unbearable strain on the concept of republican government, at least as it was understood by Madison—though with what significance for *justiciable* rights would remain profoundly uncertain (for remember that the guarantee clause has been held to be nonjusticiable). But all this is academic, for what is at issue in this case is a retail, not a wholesale, reallocation of legislative power from the legislative to the executive branch.

Not only is there no federal judicial remedy for the plaintiffs' grievance; there is a political remedy: amend the Wisconsin constitution. All that is required is that the legislature in two sessions (with a general election intervening) pass an amendatory provision by a simple majority and submit it to the voters of the state for ratification, also by a simple majority. Wis. Const. Art. XII, § 1. If the plaintiffs can muster the votes to push the bill through the legislature, it will then be up to the people. If the people want to reduce the governor's power vis-á-vis the legislature's they will ratify the proposed amendment, just as they ratified only a year ago the amendment that ended his power to create new words by deleting individual letters. There is no need to involve the federal courts in this affair and no legal basis for doing so.

AFFIRMED.