In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 19-3138

DEMOCRATIC PARTY OF WISCONSIN,
*et al.*,

*Plaintiffs-Appellants*,

*v.*

ROBIN VOS, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 19 C 142 — **James D. Peterson**, *Chief Judge*.

_____

ARGUED MAY 18, 2020 — DECIDED JULY 16, 2020

_____

Before WOOD, BARRETT, and SCUDDER, *Circuit Judges*.

WOOD, *Circuit Judge*. In 2018, Democrats Tony Evers and Josh Kaul were elected as the governor and attorney general of Wisconsin. Both replaced Republican incumbents. Immediately after the election, while Wisconsin still had a Republican governor, the Republican-controlled legislature enacted two laws, 2017 Wisconsin Act 369 and 2017 Wisconsin Act 370

("Acts"), which strip the incoming governor and attorney general of various powers and vest legislative committees that remained under Republican control with formerly-executive authority. The changes effected by the Acts include prohibiting the governor from re-nominating potential appointees who have been rejected once by the legislature; giving the legislature authority to suspend an administrative rule multiple times; removing the governor's ability to appoint the chief executive officer of the Wisconsin Economic Development Corporation; adding legislative appointees to the Economic Development Corporation; requiring that the attorney general obtain legislative approval before withdrawing from a lawsuit filed by the state government or settling a lawsuit for injunctive relief; and granting the legislature the unrestricted right to intervene in litigation to defend the constitutionality or validity of state law.

Dismayed by these measures, the Democratic Party of Wisconsin ("Party") and several of its individual members brought suit in federal court under 42 U.S.C. § 1983 claiming violations of the First Amendment, the Fourteenth Amendment's Equal Protection Clause, and the Guarantee Clause of Article IV, Section 4 of the United States Constitution. The defendants are the following: several members of the Wisconsin legislature ("legislative defendants"); the Secretary of the Wisconsin Department of Administration; now-Governor Evers; and now-Attorney General Kaul. (Although he was a nominal defendant, Governor Evers, along with Joel Brennan, the Secretary of the Department of Administration, initially filed a brief supporting the plaintiffs and opposing dismissal. Attorney General Kaul stayed out of the fray. None of those three is participating in this appeal.) The district court granted

the legislative defendants' motion to dismiss for lack of sub-ject-matter jurisdiction, concluding that the plaintiffs "haven't pointed to any concrete harms they have suffered or will suf-fer because of Acts 369 and 370" and "are not entitled to any remedy under the United States Constitution. Any judicial remedy for the harms alleged in this case must come from the courts of Wisconsin." We affirm.

## I

The plaintiffs based the district court's subject-matter ju-risdiction on 28 U.S.C. §§ 1331 and 1343. The legislative de-fendants argued that the district court lacked subject-matter jurisdiction because the plaintiffs did not have standing to sue and their claims raised only nonjusticiable political questions. The district court agreed with those arguments and dismissed the case, entering final judgment on September 30, 2019. The plaintiffs filed a timely appeal.

We assess *de novo* the district court's grant of a motion to dismiss for lack of subject-matter jurisdiction, "taking the facts alleged in the complaint as true and drawing reasonable inferences in [the nonmovant's] favor." *Miller v. Fed. Deposit Ins. Corp.*, 738 F.3d 836, 840 (7th Cir. 2013). We may affirm a dismissal for lack of subject matter jurisdiction on any ground supported by the record. *Fuqua v. United States Postal Serv.*, 956 F.3d 961, 964 (7th Cir. 2020).

## II

As we noted, the plaintiffs raise three claims: first, one based on their First Amendment rights to freedom of expres-sion and freedom of association; second, one based on the Equal Protection Clause of the Fourteenth Amendment; and

third, one resting on the Guarantee Clause of Article IV, Section 4 of the United States Constitution. The Party asserts that it has standing to vindicate its own rights as well as associational standing to sue on behalf of its members. The legislative defendants reject these contentions.

## A

Before a plaintiff may invoke the federal courts' judicial power, Article III of the United States Constitution requires her to demonstrate that she has standing to sue. She accomplishes that task by showing three things: (1) that she has suffered an actual or imminent, concrete and particularized injury-in-fact; (2) that there is a causal connection between her injury and the conduct complained of; and (3) that there is a likelihood that this injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). A plaintiff may not rely on only a "generalized grievance about the conduct of government." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018). In determining at the pleadings stage whether the plaintiff's showing of standing passes muster, we accept as true the pleaded factual matter and draw all reasonable inferences in favor of the plaintiff. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

As the district court pointed out, "Acts 369 and 370 do not restrict or regulate plaintiffs' conduct in any way." Rather, the Acts reduce the power of the governor and the attorney general, who were initially named as defendants in the action and never formally re-designated as plaintiffs. "[W]hen the plaintiff is not himself the object of the government action … [that] he challenges, standing is not precluded, but it is ordinarily

substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted).

The plaintiffs here seek to base their standing on "constitutional provisions that protect their voting rights." They contend that the legislature's passage of Acts 369 and 370 violated their First Amendment right to participate effectively in the political process and degraded the effectiveness of the votes cast by supporters of the Democratic Party, in violation of the Equal Protection Clause. Those people voted for Governor Evers and Attorney General Kaul with the understanding that the winners in the election would be vested with certain powers upon taking office; the result of the Acts is that the plaintiffs did not get what they believe they were entitled to. They refer to this as "vote dilution." But this is an unprecedented application of the familiar vote-dilution theory, and one that we cannot accept.

The plaintiffs attempt to marshal major voting-rights precedents in support of their claims, but all are inapposite. *Baker v. Carr*, 369 U.S. 186 (1962), and *Reynolds v. Sims*, 377 U.S. 533 (1964), addressed vote dilution that arose through state legislative apportionment that did not reflect the actual population distribution of the state. *Anderson v. Celebrezze*, 460 U.S. 780 (1983), decided the constitutionality of ballot-eligibility restrictions on candidates. *Meyer v. Grant*, 486 U.S. 414 (1988), concerned First Amendment rights to circulate and sign petitions. *California Democratic Party v. Jones*, 530 U.S. 567 (2000), considered the type of primary election a state runs (*i.e.*, closed versus blanket) and the implications that choice had for voters and political parties. *Bush v. Gore*, 531 U.S. 98 (2000), addressed the manner of counting votes in Florida in the 2000 presidential election. Finally, *Judge v. Quinn*, 612 F.3d 537 (7th

Cir. 2010), opinion amended on denial of reh'g, 387 F. App'x 629 (7th Cir. 2010), analyzed the right of voters to vote promptly for a vacated United States Senate seat rather than allow the governor to fill the seat for the unexpired term.

All these cases are about the legality and fairness of the process of raising issues, nominating candidates, and voting for those candidates. None raises the type of concern that is at the heart of this case: whether elected officials are able to achieve the substantive policy outcomes their constituents expect or desire. In fact, the Supreme Court recently signaled that disputes of this sort are nonjusticiable. *Gill*, 138 S. Ct. at 1931 ("[T]he citizen's abstract interest in policies adopted by the legislature on the facts here is a nonjusticiable general interest common to all members of the public." (internal quotation marks omitted)). We see no reason why that observation does not apply with equal force to a citizen's abstract interest in the powers and policies of the governor and attorney general conferred by state law.

The individual plaintiffs in this case were able to vote in the 2018 state election for their preferred candidates. There is no allegation that their votes were not counted or were counted differently from those of all other Wisconsin voters. Evers and Kaul won their elections and assumed the offices of governor and attorney general. To that degree, the plaintiffs' votes were effective. Only after the plaintiffs voted for Evers and Kaul did the legislature (we can assume for partisan reasons) decide to strip those offices of certain powers through Acts 369 and 370. As understandably frustrating as that is, the United States Constitution does not guarantee that state officials will have any particular powers once they assume office; that is the domain of state constitutions and statutes. The

United States Constitution guarantees only that each citizen's vote will be counted equally.

The partisan motive reflected in the fact that Republican legislators took away the specified powers from the offices of the governor and attorney general only because Democrats won does not save the plaintiffs' case. The Supreme Court has stated that, standing alone, the partisan intentions of legislators are not constitutionally suspect and that pursuing partisan ends does not violate the rights of people who disagree. See *Rucho v. Common Cause*, 139 S. Ct. 2484, 2503 (2019) ("A permissible intent—securing partisan advantage—does not become constitutionally impermissible, like racial discrimination, when that permissible intent 'predominates.'").

We therefore agree with the district court that the individual plaintiffs have not pleaded a constitutional injury-in-fact and do not have standing under Article III.

B

Next, we turn to the Party's standing, both on behalf of its members and in its own right. The Party's associational standing claim can be resolved easily: because the Party's members do not have standing to sue in their own right, the Party does not have standing to sue on their behalf. See *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

With respect to its effort to support standing on its own injuries, the Party runs into the same problem as the individual plaintiffs. The Acts do not target the Party nor do they formally restrict the Party's ability to raise funds, register voters, get candidates on ballots, or otherwise meaningfully participate in elections. Once again, the cases the plaintiffs cite are distinguishable: *California Democratic Party v. Jones* dealt with

the type of primary the state was using; *Williams v. Rhodes*, 393 U.S. 23 (1968), had to do with candidate ballot access; *Libertarian Party of Ill. v. Scholz*, 872 F.3d 518 (7th Cir. 2017), addressed candidate access to the ballot access; and *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139 (7th Cir. 2011), concerned fundraising restrictions. None of these provides support for the Party's standing here.

The Party fares no better with *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), and *Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019), which concerned voter identification and voter registration laws, respectively. In both those cases, the organizational plaintiffs had an injury sufficient to confer standing because the laws at issue affected their members' ability to vote and as a consequence forced the organizations to devote resources to counteracting the effects of the laws. There was no such injury here: Acts 369 and 370 were enacted after the election in question and do not address the process of voting or other forms of political mobilization. The named individual plaintiffs were able to, and indeed did, vote for Governor Evers and Attorney General Kaul, and there is no allegation that Wisconsin Democrats will find it more difficult to vote in future elections or elect the candidates of their choice as a result of these laws.

The immediate harm the Party has suffered is psychological: it asserts that it will have a harder time organizing voters and fielding candidates because of concerns that Democrats who win elections will have less power in office than they expect. The Party also expects an added financial burden insofar as it must spend more money to generate enthusiasm among the populace. But mobilizing voters who are discouraged or apathetic, but not actually impeded in their ability to achieve

desired electoral outcomes, is "baseline work" for a political party; it is an "ordinary program cost[]," not an "injury in fact." *Common Cause*, 937 F.3d at 955.

C

In a final effort to establish standing, the plaintiffs contend that Governor Evers is a *de facto* plaintiff even though he is named in his official capacity as a defendant. They have some cause for taking this position: Evers asked to be considered as a plaintiff in the pretrial conference report, and he filed a brief in support of the plaintiffs' preliminary injunction and in opposition to the legislative defendants' motion to dismiss. But the plaintiffs never moved to dismiss him as a defendant, nor did they formally request realignment. The district court concluded that it could not "realign the parties to preserve standing without a proper motion" and thus declined to treat Evers as a *de facto* plaintiff.

The plaintiffs argue that this was error, because Federal Rule of Civil Procedure 21 empowers the district court to determine the proper parties in a case even without a motion from one of the existing parties. Rule 21 addresses misjoinder and nonjoinder. It is permissive, stating that the court "[o]n motion or on its own, … may, at any time, on just terms, add or drop a party." To achieve the realignment the plaintiffs seek, the district court perhaps could have dropped Evers as a defendant and then added him as a plaintiff. But we can hardly accuse the court of abusing its discretion by declining to take these actions on its own initiative, without briefing from the parties about the potential issues raised by such a move. Those issues include the question whether the governor has the power to litigate in his official capacity against the state, and the question whether the legislative defendants are

entitled to legislative immunity. And, for the icing on the case, Governor Evers is not participating in this appeal, and the existing plaintiffs have not offered a reason why they have standing to raise, on his behalf, the issue of his position in the litigation. And in the end, neither the individual voters' rights nor the Party's rights are affected by Evers's ability or inability to litigate his personal claims in this case.

It is also notable that the complaint does not allege that either Evers or Kaul suffered First Amendment and Equal Protection violations in their roles as governor and attorney general. It confines itself to the constitutional rights of voters and the Party. Evers remains free to sue on his own behalf if he wants to allege constitutional violations that injure him in his role as governor (as opposed to as a member of the Democratic Party and voter), though we make no prediction about the fate of such an action. See generally *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665–66 (2015) (finding that the Arizona Legislature had institutional standing to challenge a redistricting map drawn by an independent commission). No matter: those claims are not present in this suit, and so the plaintiffs cannot establish standing on that basis.

Democratic voters in Wisconsin may have been disheartened by the Republican-controlled legislature's gambit, but that frustration is not a federal constitutional injury. As the plaintiffs themselves admit, "[p]olitical parties obviously have no constitutional right to ensure their policy preferences are adopted." Their recourse is to the voting booth, *i.e.* winning control of the state legislature (which, if held in the future by members sharing the goals of the Democrats here,

could easily undo whatever the lame-duck Republican legislature crafted), or to the state courts, not to the federal courts.

**III**

Plaintiffs also invoke the Guarantee Clause, to which we now turn. Article IV, Section 4 of the United States Constitution provides: "The United States shall guarantee to every State in this Union a Republican Form of Government…" U.S. Const. art. IV, § 4. Plaintiffs argue that Acts 369 and 370 violate the Guarantee Clause because they are inconsistent with "core norms of our democratic and republican form of government." The district court agreed with the legislative defendants' argument that the Guarantee Clause is categorically nonjusticiable, quoting dicta in *Rucho*, 139 S. Ct. at 2506, saying that "[the Supreme Court] has several times concluded, however, that the Guarantee Clause does not provide the basis for a justiciable claim." See also *City of Rome v. United States*, 446 U.S. 156, 182 n.17 (1980) ("We do not reach the merits of the appellants' argument that the Act violates the Guarantee Clause, Art. IV, § 4, since that issue is not justiciable."); *Baker v. Carr*, 369 U.S. at 217–29; *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118, 147–51 (1912).

Plaintiffs argue that this statement in *Rucho* does not reflect a bright-line rule that Guarantee Clause claims are *never* justiciable, but rather acknowledges only that the Supreme Court has not yet been presented with a justiciable claim. In support, they cite *New York v. United States*, 505 U.S. 144 (1992), in which the Court said that "perhaps not all claims under the Guarantee Clause present nonjusticiable political questions." *Id.* at 185 (citing *Reynolds v. Sims*, 377 U.S. at 582 ("[S]ome questions raised under the Guaranty Clause are

nonjusticiable.")). They also point to the First Circuit's opinion in *Largess v. Supreme Judicial Court for the State of Mass.*, 373 F.3d 219, 225 (1st Cir. 2004) (per curiam) ("[R]esolving the issue of justiciability in the Guarantee Clause context may also turn on the resolution of the merits of the underlying claim."), and the Tenth Circuit's opinion in *Kerr v. Hickenlooper*, 744 F.3d 1156, 1176 (10th Cir. 2014) ("[W]e reject the proposition that *Luther* and *Pacific States* brand all Guarantee Clause claims as per se non-justiciable."), vacated and remanded on other grounds by *Hickenlooper v. Kerr*, 135 S. Ct. 2927 (2015). The plaintiffs believe that theirs is the elusive justiciable claim, or at least that it is too early to conclude that it is not.

We do not interpret *Rucho* or any other decision by the Supreme Court as having categorically foreclosed all Guarantee Clause claims as nonjusticiable, even though no such claim has yet survived Supreme Court review. The district court thus went too far in saying that no Guarantee Clause claim could proceed to adjudication on the merits. Instead, it should have decided simply whether this particular Guarantee Clause claim is among the rare ones that can survive a motion to dismiss. We conclude that it is not.

Once again, standing poses a problem. See *Largess*, 373 F.3d at 224 n.5 ("It is of note for purposes of the standing inquiry that the Guarantee Clause makes the guarantee of a republican form of government *to the states*; the bare language of the Clause does not directly confer any rights on individuals vis-á-vis the states." (emphasis in original)). Moreover, even if we could surmount the standing problem here, on the

theory that state *officials* stand on a different footing than individuals and could establish the necessary personal stake, causation, and redressability, other obstacles remain.

Our opinion in *Risser v. Thompson*, 930 F.2d 549 (7th Cir. 1991) is instructive. There, Wisconsin state legislators alleged that the partial veto provision of the Wisconsin Constitution violated the First Amendment, Due Process and Equal Protection, and the Guarantee Clause. We held that the legislators had standing to sue because they alleged that the partial veto diminished the effectiveness of their votes, but we then determined that none of the constitutional claims had merit. With respect to the Guarantee Clause claim, which we noted was nonjusticiable in that case, we commented that the "[t]he [federal] Constitution does not prescribe the balance of power among the branches of state government." *Id.* at 552. This observation is not one that is favorable to plaintiffs. Within broad boundaries, state legislatures may enact measures that reallocate power between duly elected branches of state government, at least as far as federal law is concerned.

The legislative defendants here are elected officials, just like the governor and attorney general, but a "modest shift of power among elected officials is not a denial of republican government or even a reduction in the amount of democracy." *Id.* at 553. The First Circuit's decision in *Largess* is on point: "The Guarantee clause does not require a *particular* allocation of power within each state so long as a republican form of government is preserved. … If there is any role for federal courts under the Clause, it is restricted to real threats to a republican form of government." 373 F.3d at 227 (emphasis in original). The plaintiffs have not shown that the power shifts Acts 369 and 370 produced pose an existential threat to

the "republican form of government" in Wisconsin, even assuming that the legislature was trying to undo some of the consequences of the 2018 election. And we note that the Supreme Court of Wisconsin has just ruled that nearly all of the provisions challenged in the present case are consistent with the state constitution's separation-of-powers regime. See *Serv. Emps. Int'l Union (SEIU), Local 1 v. Vos*, Nos. 2019AP614-LV & 2019AP622, 2020 WI 67 (July 9, 2020). No one in that case even mentioned the Guarantee Clause, but the tenor of the state court's decision is that the legislative changes fell within accepted limits. We see no reason to conclude that the state court would have so concluded if it thought that there was an abuse serious enough to trigger the Guarantee Clause, which is of course binding on the states. See U.S. Const., Art. VI, cl. 2.

## IV

One final issue remains: the legislative defendants' motion for sanctions against the plaintiffs under Federal Rule of Appellate Procedure 38.

Under Rule 38, the court may award "just damages and single or double costs to the appellee" when an appellant files a frivolous appeal. Fed. R. App. P. 38. "An appeal is … frivolous if it presents arguments that are so insubstantial that they are guaranteed to lose." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 791 (7th Cir. 2019). "When an appeal is frivolous, Rule 38 sanctions are not mandatory but are left to the sound discretion of the court of appeals to decide whether sanctions are appropriate." *Harris N.A. v. Hershey*, 711 F.3d 794, 802 (7th Cir. 2013).

The legislative defendants contend that it is "obvious" that plaintiffs' appeal is a "futile" "political statement" and that

sanctions are therefore warranted. We do not take such a harsh view of their case. As discussed above, we do not interpret *Rucho* as having categorically foreclosed the plaintiffs' Guarantee Clause arguments. Furthermore, although we conclude that the plaintiffs do not have Article III standing to pursue either their own claims or those of Governor Evers, the record reflects that Governor Evers conveyed to the district court, though not in a motion for formal realignment, a desire to be treated as a plaintiff. Thus, the plaintiffs were within the bounds of good-faith argument to assert on appeal that the district court should have taken Governor Evers's interests into account in its standing analysis. Their jurisdictional and merits arguments ultimately may have failed, but that does not mean they are so patently frivolous as to be worthy of sanction.

## V

Because plaintiffs did not establish their standing under Article III with respect to their First Amendment and Fourteenth Amendment claims, we AFFIRM the judgment of the district court on those points. With respect to the Guarantee Clause claim, although we conclude that it is not categorically foreclosed, we nonetheless AFFIRM the judgment of the district court that this particular claim is nonjusticiable. The defendants-appellees' motion for sanctions under Rule 38 is DENIED.